# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF WISCONSIN

IRMA MARTINEZ     )
           )
    Plaintiff,    )
           )
    vs.      )
           )  Civil Action No. _____
JEFFERSON N. CALIMLIM,  )
ELNORA M. CALIMLIM,   )
JEFFERSON M. CALIMLIM,  )  JURY TRIAL DEMANDED
CHRISTOPHER JACK CALIMLIM, )
CHRISTINA CALIMLIM   )
           )
    Defendants.   )

## COMPLAINT

   Plaintiff Irma Martinez, by and through her undersigned Attorneys, brings this action

against Defendants and Co-conspirators Dr. Jefferson N. Calimlim, Dr. Elnora M. Calimlim,

Jefferson M. Calimlim, Christopher Jack Calimlim, and Christina Calimlim, alleging as follows:

## INTRODUCTION

   (1)  This is an action for damages brought by Irma Martinez ("Martinez" or

"Plaintiff"), who was trafficked into the United States and forced to work against her will as a

domestic servant in the Calimlims' Brookfield, Wisconsin residences and their investment

property for nineteen years.  Human trafficking includes the recruitment, harboring,

transportation, provision, or obtaining of a person through the use of force, fraud, or coercion for

the purpose of subjection to servitude, peonage, debt bondage, or slavery.

   (2)  On May 26, 2006, a jury convicted Defendants and Co-conspirators Dr. Jefferson

N. Calimlim ("Jefferson Sr.") and Dr. Elnora M. Calimlim ("Elnora") (collectively, the "Parent

Defendants") of obtaining and conspiring to obtain forced labor, in violation of 18 U.S.C. §§

1

371, 1589 and 1594; and harboring and conspiring to harbor an alien for private financial gain, in violation of 8 U.S.C. § 1324(a)(1). Their eldest son, Jefferson Calimlim Jr. ("Jefferson Jr.") was convicted of illegally harboring Martinez and was sentenced to 120 days of home confinement and three years of supervised release.

(3)     The U.S. Court of Appeals for the Seventh Circuit affirmed the Parent Defendants' convictions, concluding that ample evidence supported the convictions on all counts. *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008). The Seventh Circuit remanded the case to the District Court for resentencing, on the grounds that the District Court erred in refusing to apply three sentencing enhancements: (1) the "any other felony" enhancement under U.S.S.G. § 2H4.1; (2) the "vulnerable victim" enhancement under U.S.S.G. § 3A1.1(b)(1); and (3) the "use of minor children" enhancement under U.S.S.G. § 3B1.4. *Id.* at 715–18.

(4)     Defendants and Co-conspirators Jefferson Jr., Christopher Jack Calimlim ("Jack") and Christina Calimlim ("Christina") (collectively, the "Children Defendants")[1] participated directly in the criminal conspiracy to traffic and harbor Plaintiff, in violation of 18 U.S.C. § 1962(d).

## JURISDICTION AND VENUE

(5)     This Court's subject-matter jurisdiction rests upon 28 U.S.C. § 1331 and 18 U.S.C. § 1964. Supplemental jurisdiction over state law claims exists under 28 U.S.C. § 1367.

(6)     Venue is proper in this district pursuant to 18 U.S.C. § 1391 and § 1965 because at all material times one or more Defendants resided or maintained their principal place of

---

[1] Jefferson Jr. was born in 1974 and reached the age of majority in 1992. Jack was born in 1976 and reached the age of majority in 1994. Christina was born in 1980 and reached the age of majority in 1998.

residence in this District. In addition, a substantial part of the acts and occurrences giving rise to this Complaint arose in this District.

# PARTIES

*Plaintiff*

(7)    Plaintiff is a 42-year-old citizen of the Philippines, who resides in the State of Illinois.  She entered the United States on a valid, multi-entry visa, which expired on June 21, 1987.  She obtained a T Visa after she escaped the custody and control of Defendants and Co-conspirators; that visa permits her lawfully to remain in the United States.  Plaintiff is the victim of the racketeering scheme conducted by the individual Defendants through a pattern of racketeering, including trafficking in persons, alien harboring, mail and wire fraud, as well as other unlawful acts described herein.

*Defendants and Co-conspirators*

(8)    The Parent Defendants are legal permanent residents of the United States and citizens of the Philippines.  The Parent Defendants are currently incarcerated in federal prison.

(9)    The Children Defendants are citizens of the United States.

(10)    Jefferson Jr. was approximately eleven years old when the Parent Defendants trafficked Martinez into the United States.  Jefferson Jr. resided full-time with Martinez until he left to attend college from 1992 to 1996.  After his time at college, Jefferson Jr. returned to reside permanently in the home, where he lived and forced Martinez to act as his servant until federal agents rescued Martinez on or about September 29, 2004.

(11)    Jack was approximately eight years old when the Parent Defendants trafficked Martinez into the United States.  Jack resided full-time with Martinez until he left to attend college from 1994 to 1998.  He resided in the home periodically during and immediately following his time at college.

4

(12)    Christina was approximately five years old when the Parent Defendants trafficked Martinez into the United States.  She resided full-time with Martinez until she attended college from 1998 to 2002.  Christina returned to reside in the home periodically, later moving to San Francisco, California.

(13)    At all times relevant hereto, Defendants and Co-conspirators resided in Brookfield, Wisconsin, where Jefferson Sr. was a practicing physician and Elnora was a non-practicing physician.  From 1995 until March 2007, the Parent Defendants resided, at times with their children — Defendants and Co-conspirators in this action — at 19120 Stillpoint Trail, Brookfield, Wisconsin 53045.  The Parent Defendants are currently serving a four-year prison sentence for human trafficking and using threats of serious harm and physical restraint against Plaintiff to obtain her services as their domestic servant for nineteen years.

## FACTUAL ALLEGATIONS

### *A. Trafficking in Persons*

(14)    Trafficking in persons is a global phenomenon and an egregious human rights violation.  The U.S. government estimates that approximately 800,000 people are trafficked across international borders each year.[2]

(15)    Human traffickers prey on vulnerable members of society.  They typically trick, coerce, or win the confidence of their victims through false promises of a better life.[3]  Victims are often lured with false promises of good jobs and better lives, only to find themselves trapped in brutal or dangerous conditions.[4]

---

[2] U.S. Dep't of State, Trafficking in Persons Report at 8 (June 2007).
[3] *Id.* at 9.
[4] U.S. Dep't of Justice, Attorney General's Annual Report to Congress on U.S. Government Activities to Combat Trafficking in Persons, Fiscal Year 2006 at 1 (May 2007).

Case 2:08-cv-00810-LA   Filed 09/25/08   Page 5 of 39   Document 1

(16)    Trafficking is a transnational criminal enterprise, generating billions of dollars each year.[5]  It is the fastest-growing source of profits for organized criminal enterprises worldwide.[6]

(17)    To combat trafficking, the United States has joined 113 other nations to become a party to the United Nations Protocol to Prevent, Suppress, and Punish Trafficking in Persons.  In 2000, Congress enacted the Trafficking Victims Protection Act to combat trafficking in persons for the purpose of forced labor and forced prostitution.

### B. Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise

(18)    Some traffickers are part of large criminal organizations.  Others, like Defendants and Co-conspirators in this case, are individuals who traffic human beings for personal profit and benefit.

(19)    Defendants and Co-conspirators were members of the Calimlim Family, which included Elnora's parents, Dr. Jovito Mendoza ("Dr. Mendoza") and Mrs. Bending Mendoza ("Mrs. Mendoza").  The Calimlim Family constitutes an enterprise (the "Human Trafficking and Alien Harboring Enterprise") that the Parent Defendants operated both for legitimate and illegitimate purposes.

(20)    The Parent Defendants managed the Human Trafficking and Alien Harboring Enterprise, directing the family, operating a household that by outward appearances seemed completely normal, providing instructions to the Children Defendants on how to conceal Martinez's presence in the home, and directing Dr. Mendoza and Mrs. Mendoza to make fraudulent payments of Martinez's illegal "salary" to Martinez's parents in the Philippines.

---

[5] U.S. Dep't of State, Trafficking in Persons Report at 13–14 (June 2005) ("According to the U.S. Federal Bureau of Investigation, human trafficking generates an estimated $9.5 billion in annual revenue.").
[6] Findings, Pub. L. No. 106-386 at § 102(b)(8), 114 Stat. 1464, 1467.

(21)     Dr. and Mrs. Mendoza, Elnora's parents, remained in the Philippines, where they facilitated the Human Trafficking and Alien Harboring Enterprise by recruiting Martinez, arranging her travel to the United States, obtaining a fraudulent visa for Martinez from the U.S. Embassy in Manila, the Philippines, and making miniscule payments of Martinez's "salary" to her family in the village of Naga, the Philippines.  Dr. Mendoza died in 1993.

(22)     The Human Trafficking and Alien Harboring Enterprise controlled every aspect of Martinez's life.

(23)     Each member of the Human Trafficking and Alien Harboring Enterprise played a role in trafficking and/or harboring Martinez and took affirmative acts to ensure that she would remain imprisoned in the Defendants' and Co-conspirators' home.

### C. Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Transporting Martinez to the United States

(24)     Martinez was born in the Philippines on May 16, 1966.  She is the oldest of eight children.  Because she was held by Defendants and Co-conspirators for nineteen years and never permitted to leave Defendants' and Co-conspirators' home without permission, she has never met her two youngest siblings.

(25)     When Martinez was approximately sixteen years old and still living in the Philippines, she began working as a live-in housekeeper for Dr. Mendoza, a wealthy physician from her village.

(26)     While working for Dr. Mendoza, Martinez learned that his daughter, Elnora, and her husband, Jefferson Sr., lived in the United States and were seeking assistance with childcare and a small amount of house cleaning.

(27)     Martinez initially chose not to pursue this job, because her father felt she was too young.

7

(28)    Dr. Mendoza persisted in recruiting Martinez for the purported babysitting job; she eventually accepted it, believing that it would allow her to earn a substantial amount of money to support her family.

(29)    Dr. Mendoza and his wife met with Martinez's parents to discuss the job opportunity and eventually consented to the purported arrangement.

(30)    Neither Dr. Mendoza, his wife, nor the Parent Defendants presented Martinez with a written employment contract at any time.  Instead, they assured her that a written contract would not be necessary and that they would discuss the terms of the arrangement upon her arrival in the United States.

(31)    Dr. Mendoza and his wife made all arrangements to bring Martinez to the United States, helping her to obtain both a passport and a visa, and purchasing her plane ticket to fly from Manila to Chicago.

(32)    Martinez arrived in the United States on or about July 21, 1985.

(33)    When Martinez arrived in the United States, the Parent Defendants informed her that she was in the United States illegally, confiscated her passport, and told her she would have to reimburse the Mendozas for the cost of her plane ticket.  The Parent Defendants immediately put Martinez to work in their residence.

### D. Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Deception and Fraud

(34)    Martinez — who, upon arriving in the United States, had no money and spoke and understood almost no English — was vulnerable.

(35)    Defendants and Co-conspirators grossly exploited Martinez's vulnerability, deceiving and betraying her in the following ways:

a.      The week after Martinez arrived in the United States, the Parent Defendants informed her that she would be earning $100 a month — far less than she had earned working in the Philippines and far less than they promised her she would earn.

b.      Martinez asked the Parent Defendants to send money home to her family in the Philippines, but the Parent Defendants provided her with no documentation of money transfers and prohibited her from having regular communication with her parents.

c.      The Parent Defendants did send small amounts of money to the Philippines for Martinez's family, using the U.S. banking system and the Mendozas (Elnora's parents) to make the transfers.  Over a nineteen-year period, these payments amounted to no more than $18,000.

d.      Despite their promises to do so, the Parent Defendants failed to provide Martinez with a bank account and to deposit Martinez's earnings into such an account.

e.      Despite their promise to do so, the Parent Defendants failed to secure a legal visa for Martinez during the time she lived and worked for them; instead, they allowed her visa to lapse (although they had the appropriate forms), causing Martinez to become an undocumented alien working illegally in the United States.

f.      Defendants and Co-conspirators exploited Martinez's illegal status — a status they themselves created — by telling her that she should be patient, because one day the President would grant illegal aliens amnesty and Martinez would then be able to visit her family in the Philippines.

g.      Defendants and Co-conspirators confiscated, read, and controlled access to Martinez's mail.  Parent Defendants diverted Martinez's letters from the U.S. mail in furtherance of their scheme to conceal Martinez's labor.  Defendants and Co-conspirators falsely told

9

h.     Defendants and Co-conspirators forced Martinez to send letters to her family in the Philippines only through the Calimlim Family; only the Defendants and Co-conspirators could place her letters in the U.S. mail.  When Defendants and Co-conspirators permitted Martinez to send letters, they also required that she use two envelopes to mail her letters, use a fraudulent identity as the return address on the envelope, and post only through a dedicated P.O. Box secured for the purpose of transmitting communications to the Philippines. These acts had the effect of isolating Martinez even more, which made her more vulnerable to Defendants and Co-conspirators and furthered their scheme to maintain her involuntary labor.

(36)     The Children Defendants' deception and betrayal of Martinez is especially cruel.

a.     Martinez cared for the Children Defendants and felt great affection for them.

b.     Martinez continues to feel affection for the Children Defendants even today, despite their participation in her nineteen-year enslavement.  Since her rescue from the Calimlim Family home, however, she has realized that the Children Defendants participated directly in her enslavement.

c.     Soon after Martinez arrived in the United States, she overheard Elnora explain to Christina that Martinez was in the country illegally.  Christina and the other Children Defendants, fully aware of Martinez's status in the United States, committed affirmative acts to

10

conceal her presence in the Defendants' and Co-conspirators' home and to make her believe that escape was impossible. They committed these acts repeatedly during the nineteen years in which they enslaved Martinez.

### E. Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Exploiting Martinez for the Purpose of Forced Labor

(37)     At the time Martinez arrived in the United States and for her first five or six years in the country, Martinez spoke and understood very little English.

(38)     The Parent Defendants forced Martinez to work in their residences, office, and investment property from 6 a.m. to 10 or 11 p.m., seven days a week.

(39)     The work that Defendants and Co-conspirators required Martinez to perform over the years far exceeded what the Mendozas represented the job would entail, both in quantity and scope.

(40)     Tasks that Defendants and Co-conspirators forced Martinez to perform at the residences included, *inter alia*, the following:

      a.     Each weekday, Defendants and Co-conspirators forced Martinez to:

          (1)     Prepare breakfast for the entire family;

          (2)     Prepare the children's school lunches;

          (3)     Make the beds;

          (4)     Clean the bedrooms;

          (5)     Clean the bathrooms;

          (6)     Wash the breakfast dishes;

          (7)     Vacuum all rooms in the house;

          (8)     Prepare after-school snacks for the children;

(9)     Prepare dinner for the entire family, which included preparing

different meals to suit the individual preferences or diets of

Defendants and Co-conspirators; and

(10)    Wash the dinner dishes.

b.      On Mondays, Martinez ironed the bed sheets.

c.      On Fridays, Martinez began the laundry. Defendants and Co-conspirators

permitted Martinez to begin the laundry no earlier than 6 p.m., forbidding her from doing any

laundry during the day because water and electricity were too expensive. She was often unable

to finish the laundry until Sunday.

d.      Defendants and Co-conspirators also forced Martinez to act as a personal

attendant to Elnora, which required Martinez to:

(1)     Bring Elnora breakfast in bed every day;

(2)     Lay out Elnora's clothing each morning;

(3)     Bring Elnora fresh towels and slippers after her shower;

(4)     Style Elnora's hair; and

(5)     Bring Elnora her medicine each morning and each evening.

e.      Martinez performed any and all the other tasks Defendants and Co-

conspirators demanded of her, at any hour of the day or night.

f.      If Martinez failed to perform any task satisfactorily to Defendants and Co-

conspirators, Jefferson Sr. — whose violent temper was exacerbated by his consumption of

alcohol — verbally and physically abused her.

(41)     Defendants and Co-conspirators forced Martinez to devote a substantial amount of her time to caring, cleaning and cooking for the Children Defendants — whom she loved and reared.

(42)     In addition to Martinez's duties at Defendants' and Co-conspirators' residence, Defendants and Co-conspirators forced Martinez to clean and repair investment property they owned, which included condominiums and two-story apartments (the "Investment Property").

(43)     Martinez's duties at the Investment Property required her to perform the following tasks:

     a.     On a weekly basis, Defendants and Co-conspirators forced Martinez to:

          (1)     Clean the Investment Property, including the rental apartments;

          (2)     Clean the basement; and

          (3)     Clean the hallways;

     b.     When a tenant moved out, Defendants and Co-conspirators forced Martinez to:

          (1)     Thoroughly clean the apartments; and

          (2)     Remodel the apartments, including re-caulking the bathtubs, and scrubbing and revarnishing the cabinets;

     c.     The work Defendants and Co-conspirators forced Martinez to perform at the Investment Property was physically demanding and particularly difficult for Martinez, given her small stature.

     d.     Defendants and Co-conspirators permitted Martinez no reprieve from her duties at their residence on days when they forced her to work at the Investment Property; as

usual, they required her to continue to cook and clean for the family and would not allow her to eat until they had finished eating.

      e.    Like all the other labor Martinez performed, the Defendants and Co-conspirators never paid Martinez for this work.

(44)    In addition to Martinez's duties at Defendants' and Co-conspirators' residence and Defendants' and Co-conspirators' Investment Property, they forced her to clean Jefferson Sr.'s office and medical equipment at night several times a month.

(45)    Defendants and Co-conspirators increased Martinez's duties when they moved into a $1.2 million three-story mansion in 1995 (the "1995 Residence").

(46)    The 1995 Residence included six bedrooms, seven bathrooms, four staircases, a basement, and a four-car garage.

      a.    Martinez's duties at the 1995 Residence included the following, in addition to her other duties:

          (1)    Power-washing their four-car garage;

          (2)    Power-washing their tennis courts;

          (3)    Washing and waxing Defendants' and Co-conspirators' multiple cars at least once a week; and

          (4)    Changing oil in those cars.

      b.    Both the Parent Defendants and the Children Defendants went to great lengths to conceal Martinez's presence in their home; those extreme efforts are discussed *infra* Part F.  In furtherance of concealing her presence, Defendants and Co-conspirators ordered Martinez to keep the garage door shut while she washed the cars so that no one would see her.

They permitted her to open the garage door only a few inches to allow water to drain out of the garage.

(47)     After Defendants and Co-conspirators moved into the 1995 Residence, they hosted several holiday parties a year, for which they forced Martinez to begin preparing three weeks in advance.  As the day of the party drew near, Martinez often worked for three or four days straight with almost no sleep.

(48)     In preparation for the parties, Martinez prepared food, ironed napkins, polished silverware, washed dishes, organized cabinets, vacuumed each floor, wrapped gifts, decorated the house, and cleaned and waxed Defendants' and Co-conspirators' cars.

(49)     Despite these additional duties, Defendants and Co-conspirators continued to force Martinez to complete her other regular tasks.

(50)     The holiday parties generally began around 3 p.m. and lasted until midnight. Defendants and Co-conspirators often forced Martinez to clean up after the party, which took until 4 a.m. or 5 a.m. — leaving her virtually no time to rest or sleep before Defendants and Co-conspirators forced her to start her daily work all over again.

(51)     During the parties, Defendants and Co-conspirators forced Martinez to remain in her bedroom, with her door locked; she was forbidden to leave the room for any reason.

(52)     On at least four or five occasions, Defendants and Co-conspirators brought Martinez with them on family vacations so that she could continue to provide them with involuntary labor; these vacations required Defendants and Co-conspirators to transport Martinez across state lines.  Defendants and Co-conspirators brought Martinez on trips to Michigan and to Florida so that she could take care of the children.  Defendants and Co-conspirators forced Martinez to prepare breakfast and get the family's clothes ready each day.

15

(53)     In order to conceal her presence in the United States, Defendants and Co-conspirators traveled by car on these trips.  For other family vacations that did not include Martinez, the family flew on commercial air carriers.

(54)     The Children Defendants forced Martinez to work as their servant well into their adulthood.

(55)     Each of the Children Defendants attended college.  When they returned to the residence as adults, they forced Martinez to:

        a.     Do the laundry they had accumulated since the last time they had been to the residence;

        b.     Clean their bedrooms;

        c.     Clean their bathrooms;

        d.     Prepare their meals; and

        e.     Wash their dishes.

(56)     In short, each and every time the Children Defendants returned home as adults, they forced Martinez to work against her will and profited from the fruits of her involuntary labor.

(57)     Each of the Children Defendants knew that Martinez was in the United States illegally and took affirmative steps to conceal her presence from the outside world.

### F. Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Defendants' and Co-conspirators' Great Efforts to Isolate, Conceal, and Confine Martinez

(58)     Defendants and Co-conspirators went to such great lengths to isolate, conceal, and confine Martinez that none of their closest friends or neighbors knew that Martinez resided with and worked for them for nineteen years.

(59)     The Parent Defendant and Children Defendants' friends learned of Martinez's existence only after federal agents discovered a terrified Martinez hiding in the closet of her basement bedroom.

(60)     The Children Defendants understood from a very young age that they were not allowed to discuss Martinez and her status in their residence; the Parent Defendants established a family rule — which the Children Defendants obeyed until the day federal agents freed Martinez — that Martinez was not to be discussed anyone outside of the Calimlim Family.

(61)     Defendants and Co-conspirators used a number of tactics to isolate, conceal, and confine Martinez, including threatening her with jail and deportation if she were discovered.

(62)     The Parent Defendants severed Martinez's ties with her friends and family in the Philippines immediately upon her arrival in the United States.

(63)     Because Martinez had no friends or family in the United States, she was forced to rely on Defendants and Co-conspirators for all knowledge and information that she received.

(64)     Defendants and Co-conspirators strictly controlled Martinez's communication with her own family and often withheld her letters to her family.

(65)     Defendants and Co-conspirators instructed Martinez to send letters to her parents through them.  Elnora collected Martinez's letters, but Martinez's parents received fewer than half of the letters.

(66)     Defendants and Co-conspirators refused to permit Martinez to speak with her family by telephone until 1996 — eleven years after she arrived in the United States.

(67)     During the nineteen years that Martinez was forced to labor for Defendants and Co-conspirators, she was permitted to speak to her family over the phone on just four or five occasions.

17

(68)     In addition to severing Martinez's ties to family and friends in the Philippines, Defendants and Co-conspirators made every effort to isolate Martinez and hide her from the outside world, forcing her to live an invisible and anonymous existence.  For example:

a.     Martinez was forbidden to walk out the front door of the first residence at which she lived with Defendants and Co-Conspirators.

b.     Martinez never answered the front door of the residence, unless she knew it was a member of Defendants' and Co-conspirators' family;

c.     Martinez answered the front door of the 1995 Residence only once — on Halloween, when she wore a mask to conceal her identity;

d.     If anyone visited the residence, Defendants and Co-conspirators forced Martinez to hide in her basement bedroom;

e.     When the Children Defendants were young, Martinez was not permitted to play outside with them, except occasionally on the driveway with Christina;

f.     Defendants and Co-conspirators permitted Martinez to walk to a church selected by Elnora, only via a back path that was well away from possible observation. Elnora did not permit Martinez to go to the same church too many times in a row;

g.     If Defendants and Co-conspirators took Martinez to church with them, she was forced to sit lower in the car so as to avoid being seen.  She also sat separate from the family at church and was instructed not to talk to anyone.  Often Defendants and Co-conspirators would drive Martinez to a separate church altogether to avoid any association with Defendants and Co-conspirators.

h.      On one occasion, Defendants and Co-conspirators berated Martinez after they learned that she had met a woman at church named "Dr. Susan," who had invited her to a party.

(69)    Because Martinez was not permitted to leave the house or have any contact with the outside world, she was unable to seek assistance or legal counsel until her rescue from the Calimlim Family home on September 29, 2004.

(70)    When Defendants and Co-conspirators drove with Martinez in the car to any destination, they ordered her to ride in the back seat with her head down so that no one would see her.

(71)    Jefferson Jr., Jack, and Christina frequently drove Martinez on errands, to the mall, or to church; they too demanded that she conceal her presence by sitting low in the back seat and shielding her face.

(72)    When Defendants and Co-conspirators transported Martinez across state lines to secure her involuntary labor during their family vacations, they traveled only by car to conceal her presence.  At the Parent Defendants' criminal trial, Christina testified that the family did not travel by air with Martinez "[b]ecause she was illegal."  (Tr. at 571, lines 16-18.)

(73)    So great were the steps Defendants and Co-conspirators took to conceal Martinez's presence that they developed and used an elaborate, separate phone system only for her.  Under this phone system, Martinez was permitted to answer the main home line only after ten rings; the ten rings signaled to Martinez that one of the Children Defendants was calling. Defendants and Co-Conspirators established a separate line altogether that they used to contact Martinez, check on her whereabouts, and make service and chore requests.  The Children

Defendants also used this special phone system to warn Martinez if they were bringing friends over so she would know to go to her room and remain out of sight.

(74)     The Children Defendants knew that these affirmative steps were taken to conceal Martinez's illegal status in the country and to allow them to continue harboring her for the purpose of exploiting her labor.

(75)     Defendants and Co-conspirators prohibited Martinez from making any friends or meeting with anyone outside of their immediate family.

(76)     Jack went to such great lengths to conceal Martinez's status and identity that he lied about her to Sherry Bantug ("Bantug"), who ultimately became his wife.

(77)     Jack initially told Bantug that Martinez was an aunt from Chicago and persisted with this lie for many months.

(78)     Christina facilitated the concealment by adhering to all family rules regarding Martinez's status and ensuring that Martinez stayed hidden.  For example, Christina would often tell Martinez that Christina's friends were coming over and instruct Martinez to go to her room and not come out.

(79)     The Children Defendants were aware that the Calimlim Family was harboring an illegal alien in their home.  Martinez had regular discussions with Jack and Christina during her nineteen-year captivity about her homesickness and her desire to return to her family in the Philippines.  At least once a month, and even more frequently during the holiday seasons, Martinez told Jack and Christina of her wish to return home to see her family.  Christina would often respond by reminding her that if she ever left, Martinez would have to remain in the Philippines forever, as she lacked a legal visa.  Jack frequently told Martinez that she could not go home to the Philippines without a U.S. visa.

(80)     On the rare occasions when Defendants and Co-conspirators permitted Martinez to leave the residence, they insisted upon escorting her.

(81)     If Martinez wanted to purchase any supplies for herself at a store, she would collect the items at the store and leave them close to the cashier.  Elnora or the Children Defendants would then enter the store, find the items, and purchase them for her.

### G. Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Longstanding Abuse and Neglect of Martinez

(82)     The Parent Defendants emotionally abused and neglected Martinez.

(83)     Jefferson Sr. often lost his temper and yelled at Martinez when he was angry. When he became upset, he often drank alcohol.

(84)     Jefferson Sr. controlled the entire family, dictating the family's activities and masterminding the Human Trafficking and Alien Harboring Enterprise.

(85)     On one occasion, less than two years after Martinez began working for Defendants and Co-conspirators, Jefferson Sr. lost his temper and threw a shoe at Martinez because she did not hear him calling her name.

(86)     On another occasion, Jefferson Sr. forced the whole family to return home from vacation long before scheduled because Jack had angered him.  The family took an annual trip to Florida each Spring; that year Jefferson Sr. ordered the entire family into the car and drove back to Wisconsin in silence.

(87)     Jefferson Sr.'s temper terrorized Martinez, as she lived in constant fear that he would harm her.

(88)     Defendants and Co-conspirators refused to provide any health care for Ms. Martinez during the nineteen years she lived and worked for them.

(89)     Throughout the nineteen years that Martinez was forced to work for Defendants and Co-conspirators, she would suffer from severe menstrual cramps that caused her to drop to the floor in pain.  Elnora occasionally provided Martinez with painkillers but refused to allow her to see a doctor for treatment.  Instead, Elnora told Martinez that she would probably not be able to bear any children.  Elnora's statement was not based on any medical examination but was made simply to demoralize and insult Martinez.

(90)     Elnora's pronouncement — and Defendants' and Co-conspirators' effective imprisonment of Martinez — shattered Martinez's dreams of having her own family.  Her captivity made it impossible for her to have a relationship and become a mother, her most fervent dream.

(91)     When Martinez broke a tooth, Defendants and Co-conspirators again ignored her pleas to see a doctor or dentist; instead, they informed her that medicine in the United States was too expensive.  Martinez suffered toothaches for fifteen years, until she was rescued from Defendants and Co-conspirators and finally able to receive proper care.

(92)     Over the years, Martinez was constantly homesick and often informed Defendants and Co-conspirators of her desire to return to the Philippines to see her family.  Defendants and Co-conspirators preyed upon Martinez's fears for the health and well-being of her family, warning her that her family would fall into financial ruin if she did not continue to work for the Defendants and Co-conspirators.

### H. Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Martinez's Rescue From Captivity

(93)     During the last five years of Martinez's effective imprisonment, she began to form a friendship with Bantug, then-girlfriend and later wife of Jack.

(94)     During Bantug's marriage with Jack, she confronted him about Martinez and her relationship to the family.

(95)     Initially, Elnora and Jack lied, telling Bantug that Martinez was a relative from Chicago.

(96)     Bantug persisted and discovered that Martinez was in fact an undocumented alien — an undocumented alien whose presence Defendants and Co-conspirators concealed and who could not leave the confines of the Calimlim Family home.

(97)     In 2004, soon after divorcing Jack, Bantug called federal authorities to alert them to the fact that Martinez was an undocumented alien held in Defendants' and Jefferson Jr.'s residence.

(98)     On or about September 29, 2004, federal agents from the Department of Homeland Security and the Federal Bureau of Investigation executed a search warrant on Defendants' and Jefferson Jr.'s residence.

(99)     Elnora told Martinez that the police were looking for her and ordered her to hide.

(100)   Jefferson Jr. lied to federal agents when they arrived at the family's 1995 Residence, telling them that he did not know where Martinez was and had not seen her in about one year.

(101)   Moments after Jefferson Jr. lied to federal agents, the agents discovered Martinez hiding in a closet in her basement bedroom, trembling with fear.

(102)   After federal agents discovered Martinez, they placed her in a shelter.

(103)   Martinez suffered severe emotional distress as a result of Defendants' and Co-conspirators' cruelty and criminal acts.

(104)   Among other things, Defendants and Co-conspirators caused Martinez to experience fear, depression, humiliation, and mental anguish.  She received psychiatric care to combat her severe distress and anxiety, but she continues to have difficulty eating and sleeping.

(105)   Martinez was introduced to immigration lawyers who volunteered to help her. Around 2006, Martinez received a T Visa, validating her status as a victim of human trafficking.

(106)   As a result — and at long last — Martinez is free from Defendants' and Co-conspirators' threats, abuse, neglect, and physical control.

## CAUSES OF ACTION

### COUNT I
### CIVIL RICO: 18 U.S.C. § 1962(c)
### (Against the Parent Defendants)

(107)   Martinez incorporates paragraphs 1 through 106 as if set forth fully herein.

(108)   The Parent Defendants are "persons" as defined under 18 U.S.C. § 1961(3).

(109)   Beginning in 1985, the Parent Defendants established their family as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Human Trafficking and Alien Harboring Enterprise").  Members of the Human Trafficking and Alien Harboring Enterprise included the Parent Defendants, the Children Defendants, and Elnora's parents, the Mendozas.

(110)   The Human Trafficking and Alien Harboring Enterprise constituted an ongoing structure of persons associated through time and common control, joined in the purpose of not only carrying out the legitimate day-to-day activities of a normal family but also in being used by Defendants and Co-conspirators for the purpose of obtaining, concealing, and maintaining Martinez's involuntary labor.  The members of the Human Trafficking and Alien Harboring Enterprise were organized and acted in a manner of hierarchical decision-making controlled by

the Parent Defendants for the purpose of carrying out the illegal scheme set forth above. The Human Trafficking and Alien Harboring Enterprise spanned two continents, with ongoing activities around Milwaukee, Wisconsin and in the Philippines over a period of more than nineteen years.

(111) The Parent Defendants controlled the Human Trafficking and Alien Harboring Enterprise and knowingly committed a pattern of racketeering activity. The Parent Defendants agreed to and did directly and indirectly conduct and participate in the conduct of the Human Trafficking and Alien Harboring Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of obtaining, concealing, and maintaining Martinez's involuntary labor, in violation of 18 U.S.C. § 1962(c).

(112) At all material times, Defendants and Co-conspirators operated the Human Trafficking and Alien Harboring Enterprise for both legitimate and illegitimate purposes. For example:

a.      The Human Trafficking and Alien Harboring Enterprise engaged in legitimate activities that included functioning as a nuclear family unit. The Parent Defendants cared for and raised the Children Defendants (to the extent they did not force Martinez to assume that role). The Human Trafficking and Alien Harboring Enterprise members lived together, dined together, and vacationed together.

b.      The Human Trafficking and Alien Harboring Enterprise engaged in frequent communications between the Philippines and the United States. Much of this communication by mail and wires involved the maintenance of close family ties between the Mendozas and their daughter (Elnora) and their grandchildren, the Children Defendants, in the United States.

c.       The Human Trafficking and Alien Harboring Enterprise engaged in illegitimate activities that included trafficking Martinez to the United States and harboring Martinez for the purpose of obtaining, concealing, and maintaining Martinez's involuntary labor.

(113)   At all material times, the Human Trafficking and Alien Harboring Enterprise affected interstate commerce.  The Parent Defendants and the Mendozas trafficked Martinez across international borders for the purpose of obtaining her involuntary labor, transported her across state borders, transported her within the state of Wisconsin, sent a tiny portion of her wages to the Philippines, and removed Martinez from the legitimate labor force.

(114)   The following predicate acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

a.       **18 U.S.C. § 1590: Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor.**  The Parent Defendants knowingly developed and controlled the Human Trafficking and Alien Harboring Enterprise to recruit, harbor, transport, provide and obtain the labor and services of Martinez to each Defendant and Co-conspirator, subjecting Martinez to a condition of involuntary servitude, forced labor and enslavement.

b.       **18 U.S.C. § 1589: Forced Labor.**  Defendants and Co-conspirators knowingly developed and controlled the Human Trafficking Enterprise to obtain Martinez's services by means of a scheme, plan, or pattern to cause Martinez to believe that failure to work for Defendants and Co-conspirators would result in serious harm to her person or her family members, including physical harm, arrest, and detention.  On May 26, 2006, the Parent Defendants were found guilty of violating 18 U.S.C. § 1589.

c.       **8 U.S.C. § 1324: Bringing In and Harboring Certain Aliens.**  Defendants and Co-conspirators conspired to harbor and harbored an illegal alien in violation of

8 U.S.C. § 1324(a)(1) for their private financial gain. As described in detail above, each Defendant and Co-conspirator knew of Martinez's illegal status and took affirmative steps to conceal Martinez's presence in their residence throughout the entirety of Martinez's captivity. For example:

(1)     The Parent Defendants conspired to traffic Martinez from the Philippines to the United States for the purpose of securing her involuntary labor.

(2)     Defendants and Co-conspirators held Martinez against her will for nineteen years for their private financial gain.

(3)     Defendants' and Co-conspirators' private financial gain hinged upon keeping Martinez's presence in the United States a secret. To ensure their private financial gain, Defendants and Co-conspirators established an elaborate system of rules designed to conceal Martinez's presence, including requiring Martinez to hide when persons other than members of the Human Trafficking and Alien Harboring Enterprise entered the residence, permitting Martinez to answer the telephone only after ten rings signaling that a member of the Human Trafficking and Alien Harboring Enterprise was calling, communicating instructions to Martinez on a dedicated phone line, and requiring Martinez to conceal her face any time she was in public.

(4)     Defendants and Co-conspirators controlled Martinez's use of the interstate wires and mails in furtherance of their plan to conceal her presence, isolate her, and defraud her of her salary.

(5)     On at least four to five occasions, Defendants and Co-conspirators transported Martinez across interstate borders, from their Wisconsin residence to a lake home in Michigan and on annual vacations to Florida so that Defendants and Co-conspirators could force Martinez to cook and clean for the Human Trafficking and Alien Harboring Enterprise away from the residence.

(6)     On May 26, 2006, the Parent Defendants and Jefferson Jr. were found guilty of violating 8 U.S.C. § 1324.

d.     **18 U.S.C. § 1341: Mail Fraud.**  Defendants and Co-conspirators used the U.S. mails in furtherance of the Human Trafficking and Alien Harboring Enterprise and in such a manner as to constitute mail fraud in violation of 18 U.S.C. § 1341.  Specifically, throughout Martinez's captivity, Defendants and Co-conspirators diverted Martinez's letters from the U.S. mail and forced her to send financial information in her letters placed in U.S. mail by Defendants and Co-conspirators in furtherance of their illegal scheme.  Between July 20, 1985 and September 29, 2004, Defendants Co-conspirators read and often confiscated Martinez's mail. Defendants and Co-conspirators caused Martinez to send requests for payments of money to her parents in the Philippines.  Martinez's parents delivered these letters to the Mendozas, who provided Martinez's family with her fraudulently miniscule "salary"; according to testimony at the Parent Defendants and Jefferson Jr.'s trial, Martinez's family received no more than $18,000 over the nineteen-year period.  Upon information and belief, each payment was authorized by international communications between the Parent Defendants and the Mendozas.  Defendants and Co-conspirators also required Martinez to use two envelopes to mail her letters and to use a dedicated P.O. Box secured for the purpose of transmitting inaccurate, as well as legitimate,

communications to the Philippines. Defendants and Co-conspirators committed this mail fraud in furtherance of their plan to defraud Martinez out of her rightfully earned wages and to defraud Martinez's relatives out of the money she hoped to send home to them.

e. **18 U.S.C. § 1343: Wire Fraud.** Defendants, Co-conspirators, and Dr. Mendoza used the interstate and international wires in furtherance of the Human Trafficking and Alien Harboring Enterprise and in such a manner as to constitute wire fraud in violation of 18 U.S.C. § 1343. Specifically, upon information and belief, in May and June 1985, the Parent Defendants communicated with Dr. Mendoza in the Philippines by telephone to arrange for Martinez's transportation and visa application. In addition, by filing a fraudulent visa application with the U.S. Embassy in Manila in June 1985, the Parent Defendants and Co-conspirators caused electronic communications to occur between the U.S. Embassy in Manila and the U.S. Department of State in Washington, D.C. Throughout the course of Martinez's captivity, Defendants and Co-conspirators used the wires to control Martinez's movements and secure her involuntary labor on a daily basis. The elaborate telephone system and dedicated phone line used to communicate instructions to Martinez ensured that her presence would remain a secret and their misrepresentations to Martinez and her family would continue. Finally, Elnora caused communications within the banking system by opening a bank account for Martinez's "wages" on August 22, 1985, soon after Martinez arrived in the United States. Elnora closed this bank account on June 22, 1987, the day after Martinez's two-year visa expired. Defendants and Co-conspirators concocted this fraudulent scheme in furtherance of their plan to defraud Martinez of her rightfully earned wages and to prevent her escape.

f.      The Defendants and Co-conspirators committed numerous predicate acts in violation of each one of the statutes listed in (a)–(e) over the nineteen years of Martinez's enslavement by the Calimlim Family.

g.      The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

(115)   As a direct and proximate result of the actions of the Human Trafficking and Alien Harboring Enterprise, Martinez was injured in her business or property and suffered injuries, including significant economic losses.  Martinez is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

### COUNT II
### CIVIL RICO CONSPIRACY: 18 U.S.C. § 1962(d)
### (Against all Defendants and Co-Conspirators)

(116)   Martinez incorporates paragraphs 1 through 115 as if set forth fully herein.

(117)   Defendants and Co-conspirators conspired with each other to violate 18 U.S.C. § 1962(c) as specifically set forth above, in violation of 18 U.S.C. § 1962(d).

(118)   As described above, each of the Defendants and Co-conspirators planned, sanctioned, and/or facilitated and conspired to facilitate the acts leading to the substantive offense of conducting the affairs of the Human Trafficking and Alien Harboring Enterprise through a pattern of racketeering activity, which included the repeated acts alleged above, in violation of 18 U.S.C. § 1962(d).

(119)   The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Human Trafficking and Alien Harboring Enterprise described previously through a pattern of racketeering activity.

30

(120)   Defendants and Co-conspirators agreed and conspired to violate 18 U.S.C. §
1962(c) and (d), and were aware that their ongoing fraudulent acts have been and are part of an
overall pattern of racketeering activity.  The Parent Defendants and Jefferson Jr. have been
convicted of relevant predicate acts.  The remaining Children Defendants committed predicate
acts of forced labor, in violation of 18 U.S.C. § 1589; harboring certain aliens, in violation of 18
U.S.C. § 1324; and wire fraud, in violation of 18 U.S.C. § 1343.

(121)   As demonstrated in detail above, each Defendant and Co-conspirator knowingly
engaged in numerous overt and/or predicate acts in furtherance of the conspiracy, including
concealing and isolating Martinez and making material misrepresentations and omissions
designed to deprive Martinez of her rights.  Some illustrative examples include:

a.      Jefferson Sr. and Elnora knowingly made arrangements with the
Mendozas to traffic Martinez into the United States and confiscated her passport upon her
arrival;

b.      The Children Defendants, who knew of Martinez's illegal status in the
United States and the Human Trafficking and Alien Harboring Enterprise's role in creating that
illegal status for years, took affirmative steps to prevent Martinez's detection;

c.      The Children Defendants knowingly required Martinez to answer the
phone line only after ten rings in their first residence so they could order her to hide if they
planned to bring guests to the residence;

d.      The Children Defendants knowingly required Martinez to answer only the
third phone line in the 1995 Residence.  That phone line was a dedicated communication link to
transmit instructions to Martinez concerning the need to hide in her basement room;

e.     The Children Defendants drove Martinez on errands and ordered her to sit in the back of the car and conceal her face;

f.     Jefferson Jr. lived in the house beyond the age of majority and forced Martinez to act as his servant;

g.     Jefferson Jr. lied to federal agents arriving at the 1995 Residence to search for Martinez;

h.     Jack lied to his fiancée and later wife, Bantug, about Martinez's identity and presence in the residence in order to conceal Martinez's illegal and trafficked status;

i.     Christina adhered strictly to the family rules regarding Martinez, all of which were designed to conceal Martinez's illegal and trafficked status;

j.     Christina returned home periodically from college each summer and for vacation, expecting Martinez to do her laundry and act as her servant;

(122)   As a direct and proximate result of the actions of the Human Trafficking and Alien Harboring Enterprise and all Defendants' and Co-Conspirators' furtherance thereof, Martinez was injured in her business or property and suffered injuries, including significant economic losses.  Martinez is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

### COUNT III
### WISCONSIN ORGANIZED CRIME CONTROL ACT: Wis. Stat. § 946.80 et seq.
### (Against all Defendants and Co-conspirators)

(123)   Martinez incorporates paragraphs 1 through 122 as if set forth fully herein.

(124)   Defendants and Co-conspirators in the Human Trafficking and Alien Harboring Enterprise constituted an associated-in-fact enterprise pursuant to Wis. Stat. § 946.82(2).

(125)   All Defendants and Co-conspirators conducted and/or participated, directly or indirectly, in the Human Trafficking and Alien Harboring Enterprise through a pattern of racketeering activity that spanned more than nineteen years.  The pattern of racketeering activity, all in violation of Wis. Stat. § 946.83(3), comprised at least three acts over any seven year period within the nineteen years that Martinez was held in servitude.

(126)   Defendants and Co-conspirators had the same or similar intents, results, victim, and method of commission when they committed each of these acts.

(127)   At all times, Defendants and Co-conspirators operated the Human Trafficking and Alien Harboring Enterprise for both legitimate and illegitimate purposes.

(128)   At all material times, the Human Trafficking and Alien Harboring Enterprise was directed against the legitimate economy of the State of Wisconsin.  Defendants and Co-conspirators trafficked Martinez into Wisconsin for the purpose of obtaining her involuntary labor, paid Martinez an illegally low "salary" for her labor, employed Martinez in lieu of hiring a documented member of Wisconsin's labor force, and removed Martinez from the legitimate labor force.

(129)   The predicate acts listed in paragraph 114(a)–(e) and incorporated as if set forth fully herein, and the following additional predicate acts constitute a pattern of racketeering activity pursuant to Wis. Stat. § 946.82(4):

a.   **Wis. Stat. § 940.302: Human Trafficking.**  Defendants and Co-conspirators knowingly recruited, enticed, harbored, transported, and obtained Martinez's labor and services without her consent.  To traffic Martinez, Defendants and Co-conspirators:

(1)   Caused or threatened to cause financial and other harm to Martinez and her family if Martinez did not continue to perform services for an

unlawfully low "salary" and remain in the Defendants' and Co-conspirators' residence;

(2)     Caused or threatened to restrain Martinez by forcing her to stay locked in her room during holiday parties, when visitors arrived, and when the police arrived;

(3)     Confiscated Martinez's passport as soon as they trafficked her into the United States;

(4)     Extorted her services and labor pursuant to Wis. Stat. § 943.30;

(5)     Provided Martinez with false information regarding the nature of their arrangement to force her to provide labor or services and stay in the Defendants' and Co-conspirators' household; and

(6)     Engaged in debt bondage by coercing Martinez to pledge labor and services as repayment for the purchase of her plane ticket from Manila to Chicago, the purchase of necessary supplies, and housing, where the reasonable value of Martinez's labor and services was not applied toward repaying the debt and the length and nature of the labor and services was not defined.

       b.      **Wis. Stat. § 943.30: Threats to Injure or Accuse of Crime.**  Defendants and Co-conspirators knowingly and maliciously threatened to accuse Martinez of a crime or offense (i.e., illegally living and working in the United States), and threatened to injure Martinez's livelihood and the health and well-being of her family by warning her that her family would fall into financial ruin.  Defendants and Co-conspirators intended these threats to extort or compel Martinez's labor and services at an unlawfully low "salary."  In so doing, Defendants

and Co-conspirators obstructed, delayed, and/or affected the commerce of the State of Wisconsin.

   c. **Wis. Stat. § 940.31: Kidnapping.**  Defendants and Co-conspirators knowingly induced Martinez to travel from the Philippines to the United States intending to cause her to be secretly confined or imprisoned, and knowingly transported Martinez from Wisconsin to Florida, from Wisconsin to Michigan, and within Wisconsin intending that she be secretly confined or imprisoned, carried out of Wisconsin, and/or to be held in servitude against her will.

   d. **Wis. Stat. § 940.30: False Imprisonment.**  Defendants and Co-conspirators knowingly and intentionally confined Martinez without her consent and with knowledge that Defendants and Co-Conspirators had no lawful authority to confine Martinez.

**COUNT IV**
**INVOLUNTARY SERVITUDE: THE 13TH AMENDMENT AND 18 U.S.C. § 1584**
**(Against All Defendants and Co-conspirators)**

  (130) Martinez incorporates paragraphs 1 through 129 as if set forth fully herein.

  (131) Martinez brings this claim for relief under the private cause of action implied by the Thirteenth Amendment of the U.S. Constitution, and under 18 U.S.C. § 1584, both of which prohibit peonage and involuntary servitude.

  (132) As alleged herein, Defendants and Co-conspirators knowingly and willfully held Martinez in involuntary servitude in purposeful disregard of her rights, in violation of 18 U.S.C. § 1584.  Defendants and Co-conspirators threatened Martinez with physical and legal harm, and used mental and physical coercion techniques to force her to work against her will while refusing to pay her the compensation required by law.

35

(133)   Defendants' and Co-conspirators' threats of force, coercion and complete control over means of transportation, housing, food, and communication, combined with her forced isolation, caused Martinez reasonably to believe that she had no choice but to work for Defendants and Co-conspirators.

(134)   Through such actions, Defendants and Co-conspirators directed, assisted, conspired, and acted in concert with each other to create and enforce a system of involuntary servitude prohibited by the Thirteenth Amendment of the U.S. Constitution and 18 U.S.C. § 1584.

(135)   As a direct and proximate result of the actions of Defendants and Co-conspirators, Martinez suffered injuries, including severe emotional distress and economic losses.  Martinez is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## COUNT V
## TRAFFICKING WITH RESPECT TO PEONAGE, SLAVERY, INVOLUNTARY SERVITUDE OR FORCED LABOR: 18 U.S.C. §§ 1590, 1595
### (Against All Defendants and Co-conspirators)

(136)   Martinez incorporates paragraphs 1 through 135 as if set forth fully herein.

(137)   The Parent Defendants knowingly developed a scheme, plan, or pattern to recruit, harbor, transport, provide and obtain the labor and services of Martinez to each Defendant and Co-conspirator, subjecting Martinez to a condition of involuntary servitude, forced labor, and enslavement.  Plaintiff is permitted to bring a civil cause of action under the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

(138)   The Parent Defendants knowingly obtained Martinez's labor or services by means of such scheme, plan, or pattern.

(139)   The Parent Defendants were convicted of obtaining and conspiring to obtain forced labor, in violation of 18 U.S.C. §§ 371, 1589 and 1594; the Seventh Circuit upheld their convictions upheld on appeal.

(140)   The Children Defendants knowingly harbored Martinez, knowing that she was held in involuntary servitude, and going to great lengths to conceal her identity and presence, in furtherance of the scheme, plan, or pattern.

(141)   The Children Defendants violated 18 U.S.C. § 1590 by knowingly harboring and transporting Martinez for labor or services.

(142)   Defendants' and Co-conspirators' actions were conceived of maliciously, in the spirit of mischief and with a criminal indifference to civil obligations.

(143)   As a direct and proximate result of the Defendants' actions, Martinez has sustained significant damages, including severe emotional distress and economic losses.

(144)   Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees for the Defendants' and Co-conspirators' wrongful conduct.

## COUNT VI
### FORCED LABOR: 18 U.S.C. §§ 1589, 1595
#### (Against All Defendants and Co-conspirators)

(145)   Martinez incorporates paragraphs 1 through 144 as if set forth fully herein.

(146)   Defendants and Co-conspirators knowingly obtained Martinez's services by means of a scheme, plan, or pattern to cause Martinez to believe that failure to work for Defendants and Co-conspirators would result in serious harm to her person or her family members, including physical harm, arrest, and detention.

(147)   The conspiracy began in 1985, when the Parent Defendants conspired with the Mendozas to traffic Martinez into the United States and obtain her involuntary labor by force, fraud, and coercion.

(148)   Defendants' and Co-conspirators' conspiracy ended only on or about September 29, 2004 — when federal agents rescued Martinez from the Parent Defendants' and Jefferson Jr.'s residence.

(149)   Each Defendant and Co-conspirator actively isolated Martinez from all persons outside of the family and actively concealed her presence in their residence.

(150)   Defendants and Co-conspirators knowingly schemed, plotted, and planned to isolate and hide Martinez from all outside contact, in furtherance of their conspiracy to harbor Martinez for purposes of forced labor.

(151)   The Children Defendants participated directly in harboring Martinez for forced labor before and after they reached the age of majority, continuing to conceal her presence in the residences and continuing to demand that she serve as their servant even after reaching adulthood.

(152)   As a proximate result of Defendants' and Co-conspirators' actions, Martinez has sustained damages, including severe emotional distress and economic losses.

(153)   Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees for the Defendants' and Co-conspirators' wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court will enter an Order:

(1)      Entering judgment in favor of Plaintiff on all counts of the Complaint;

(2)      Awarding Plaintiff damages, including compensatory and punitive damages;

(3)      Granting judgment in favor of Plaintiff and against Defendants on claims brought under RICO as set forth in Counts I and II, and awarding Plaintiff treble damages;

(4)      Granting judgment in favor of Plaintiff and against Defendants on claims brought under the Wisconsin Organized Crime Control Act as set forth in Count III, and awarding Plaintiff double damages;

(5)      Awarding Plaintiff the costs of suit, including reasonable attorneys' fees;

(6)      Awarding pre- and post-judgment interest to the extent allowed by law; and

(7)      Granting such further relief as this Court deems just and equitable.

Dated: September 25th, 2008


/s Robert H. Friebert

| | |
|---|---|
| Robert H. Friebert (SBN: 1009206) | Jerold S. Solovy[*] |
| S. Todd Farris (SBN: 1006554) | Reena R. Bajowala[*] |
| Shannon A. Allen (SBN: 1024558) | JENNER & BLOCK |
| M. Andrew Skwierawski (SBN: 1063902) | 330 North Wabash Avenue |
| Attorneys for Plaintiff | Chicago, IL 60611-7603 |
| FRIEBERT, FINERTY & ST. JOHN, S.C. | Telephone: (312) 222-9350 |
| Two Plaza East – Suite 1250 | Facsimile: (312) 527-0484 |
| 330 East Kilbourn Avenue | |
| Milwaukee, Wisconsin 53202 | Martina E. Vandenberg[*] |
| Tel: (414) 271-0130 | Sarah A. Maguire[*] |
| Fax: (414) 272-8191 | JENNER & BLOCK |
| E-mail: rhf@ffsj.com | 1099 New York Avenue, NW – Suite 900 |
| E-mail: stf@ffsj.com | Washington, D.C. 20001-4412 |
| E-mail: saa@ffsj.com | Telephone: (202) 639-6000 |
| E-mail: mas@ffsj.com | Facsimile: (202) 639-6066 |

---

[*] Admission pending in the Eastern District of Wisconsin.