# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| IRMA MARTINEZ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:08-CV-00810 |
| vs. | ) | |
| | ) | Judge Lynn Adelman |
| JEFFERSON N. CALIMLIM, ELNORA | ) | |
| M. CALIMLIM, JEFFERSON M. | ) | |
| CALIMLIM, CHRISTOPHER JACK | ) | |
| CALIMLIM, CHRISTINA CALIMLIM | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO JEFFERSON N. CALIMLIM AND ELNORA M. CALIMLIM'S MOTION TO DISMISS COUNTS I-IV AND TO STAY COUNTS V-VI OF THE COMPLAINT

Robert Friebert
M. Andrew Skwierawski
Shannon A. Allen
S. Todd Farris
FRIEBERT, FINERTY & ST. JOHN, S.C.
Two Plaza East - Suite 1250
330 East Kilbourn Avenue
Milwaukee, Wisconsin 53202
Telephone: (414) 271-0130
Facsimile: (414) 272-8191

Jerold S. Solovy
Reena R. Bajowala
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, IL 60611-7603
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

Martina E. Vandenberg
Sarah A. Maguire
Melissa A. Cox[*]
JENNER & BLOCK LLP
1099 New York Avenue, NW - Suite 900
Washington, D.C. 20001-4412
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

---

[*] *Admission pending in the Eastern District of Wisconsin.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

ARGUMENT ............................................................................................................................ 6

I.      Applicable Legal Standard............................................................................................. 6

II.     Ms. Martinez Alleges Cognizable Federal RICO Claims................................................ 6

        A.      Ms. Martinez Alleges a RICO "Enterprise." ....................................................... 7

        B.      Ms. Martinez Alleges a Pattern of Racketeering Activity. ................................... 11

        C.      Ms. Martinez Alleges Predicate Acts of Wire Fraud and Mail Fraud With
                Sufficient Particularity. ........................................................................................ 14

III.    Ms. Martinez Alleges a Cognizable RICO Conspiracy. .................................................... 19

IV.     Ms. Martinez Alleges a Cognizable Claim Under WOCCA. ........................................... 25

V.      Ms. Martinez Alleges a Viable Theory of Relief Under the Thirteenth
        Amendment of the U.S. Constitution and Under 18 U.S.C. § 1584. ................................ 26

VI.     Counts V and VI Should Not Be Stayed Pending Re-Sentencing of the Parent
        Defendants. ...................................................................................................................... 28

CONCLUSION ........................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007) ................6

*American Manufactures Mutual Insurance Co. v. Townson*, 912 F. Supp. 291 (E.D. Tenn. 1995) ........................................................................................................................8

*Appley v. West*, 832 F.2d 1021 (7th Cir. 1987) ...........................................................12

*Ash v. Wallenmeyer*, 879 F.2d 272 (7th Cir. 1989) ........................................................18

*Bankcard America Inc. v. Universal Bancard System Inc.*, 904 F. Supp. 753 (N.D. Ill. 1995) ................................................................................................................ 13-14

*Bankers Trust Co. v. Old Republic Insurance Co.*, 959 F.2d 677 (7th Cir. 1992) ........................18

*Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind. 1991) ........................................................27

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ................................................6

*Boyle v. United States*, 129 S. Ct. 29 (2008) (mem.) ....................................................7

*Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000) ........................19, 21, 22

*Burdett v. Miller*, 957 F.2d 1375 (7th Cir. 1992) ........................................................7

*Carpenter v. United States*, 484 U.S. 19 (1987) .........................................................15

*Civil Rights Cases*, 109 U.S. 3 (1883) ...................................................................27

*Corley v. Rosewood Care Center*, 142 F.3d 1041 (7th Cir. 1998) ..........................................18

*In re Crazy Eddie Security Litigation*, 812 F. Supp. 338 (E.D.N.Y. 1993) .................................8

*Emery v. American Financial, Inc.*, 134 F.3d 1321 (7th Cir. 1998) ....................................16, 18

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007) .............................................................6

*Frymire v. Peat, Marwick, Mitchell & Co.*, 657 F. Supp. 889 (N.D. Ill. 1987) ...........................23

*Gagan v. American Cablevision, Inc.*, 77 F.3d 951 (7th Cir. 1996) .......................................13

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) ......................................11

*Hinsdale Women's Clinic, S.C. v. Women's Health Care of Hinsdale*, 690 F. Supp. 658 (N.D. Ill. 1988) ........................................................................................13, 18

*Jane Doe I v. Reddy*, No. 02-05570, 2003 WL 23893010 (N.D. Cal. Aug. 4, 2003) ..................8, 9

*Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466 (7th Cir. 2007)...........................13

*Jennings v. Emry*, 910 F.2d 1434 (7th Cir. 1990).........................................10

*Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994)........................................19

*Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797 (7th Cir. 2008) ......................6

*Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir. 1987).........................................13

*Lumbermans Mutual Casualty Insurance Co. v. Maffei*, No. 3:03-CV-00262-JWS, 2006
     WL 2032607 (D. Alaska July 18, 2006) ..........................................................8

*Manliguez v. Joseph*, 226 F. Supp. 2d 377 (E.D.N.Y. 2002).........................................28

*Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir. 1986)........................................13

*Olympic Federal v. Remp*, No. 87C8705, 1998 WL 64410 (N.D. Ill. June 16, 1998) ................16

*Pereira v. United States*, 347 U.S. 1 (1954) ......................................................16

*Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640 (7th Cir. 1995)..................................7

*Schmuck v. United States*, 489 U.S. 705 (1989) ..................................................15

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007), *cert.
     denied*, 128 S. Ct. 2431 (2008) ................................................................6

*State v. O'Connell*, 179 Wis. 2d 598, 508 N.W.2d 23 (Ct. App. 1993) ..................................25, 26

*Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995) .....................................................8

*Terry Properties, Inc. v. Standard Oil Co.*, 799 F.2d 1523 (11th Cir. 1986) ...............................27

*Tison v. Arizona*, 481 U.S. 137 (1987) ...........................................................23

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) .............................................28

*Uni\*quality, Inc. v. Infotronix, Inc.*, 974 F.2d 918 (7th Cir. 1992) ................................18

*Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516 (7th Cir. 1995)..............12, 13

*United States v. Ashman*, 979 F.2d 469 (7th Cir. 1992) .............................................24

*United States v. Avila*, 465 F.3d 796 (7th Cir. 2006)................................................20

*United States v. Bello-Perez*, 977 F.2d 664 (1st Cir. 1992).........................................22

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in East Africa*, 549 F.3d 146 (2d Cir. 2008)..............23

*United States v. Britton*, 289 F.3d 976 (7th Cir. 2002)...................................................15

*United States v. Brocksmith*, 991 F.2d 1363 (7th Cir. 1993)....................................15, 16

*United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008), *cert. denied*, __ S. Ct. __, No. 08-634, 2009 WL 56256 (U.S. Jan. 12, 2009)....................................................1, 29

*United States v. Ferguson*, 758 F.2d 843 (2d Cir. 1985)...............................................11

*United States v. Flynn*, 852 F.2d 1045 (8th Cir. 1988)..................................................10

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ......................................................11

*United States v. Jebara*, 313 F. Supp. 2d 912 (E.D. Wis. 2004) ...................................23

*United States v. Koenig*, 856 F.2d 843 (7th Cir. 1988)..................................................23

*United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), *cert. denied*, 128 S. Ct. 46 (2007)......14-15

*United States v. Leisure*, 844 F.2d 1347 (8th Cir. 1988) ................................................3

*United States v. Matera*, 489 F.3d 115 (2d Cir.), *cert. denied*, 128 S. Ct. 424 (2007).................11

*United States v. Mitra*, 405 F.3d 492 (7th. Cir. 2005) ..................................................16

*United States v. Nesbitt*, 852 F.2d 1502 (7th Cir. 1988).................................................23

*United States v. Persico*, 832 F.2d 705 (2d Cir. 1987) ..................................................11

*United States v. Ratliff-White*, 493 F.3d 812 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1070 (2008)..............................................................................................16

*United States v. Shorter*, 54 F.3d 1248 (7th Cir. 1995) .................................................22

*United States v. Starnes*, 644 F.2d 673 (7th Cir. 1981) .................................................12

*United States v. Stephens*, 46 F.3d 587 (7th Cir. 1995) ...........................................19, 20

*United States v. Townsend*, 924 F.2d 1385 (7th Cir. 1991)......................................21, 24

*United States v. Turkette*, 452 U.S. 576 (1981) .............................................................7

*United States v. Turner*, No. 07-1062, __ F.3d __, 2008 WL 5396836 (7th Cir. Dec. 30, 2008) ..................................................................................................17

*United States v. Useni*, 516 F.3d 634 (7th Cir. 2008)..............................................19, 21

*United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993) .................................................15

*United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994) .............................................22, 23

*Vega v. Contract Cleaning Maintenance, Inc.*, No 03C9130, 2004 WL 2358274 (N.D. Ill. Oct. 18, 2004) ...................................................................................................8

*Weidenfeller v. Kidulis*, 380 F. Supp. 445 (E.D. Wis. 1974) .......................................27

*Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277 (11th Cir. 2006) ....................11, 12

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. XIII, § 1 .........................................................................................26

U.S. Const. amend. XIII, § 2 .........................................................................................27

8 U.S.C. § 1324 .....................................................................................................1, 12

18 U.S.C. § 371 ............................................................................................................1

18 U.S.C. § 1589 .......................................................................................................1, 2

18 U.S.C. § 1594 ..........................................................................................................1

18 U.S.C. § 1595 ..........................................................................................................2

18 U.S.C. § 1595(b)(1) ..................................................................................................2

18 U.S.C. § 1962(c) .....................................................................................................20

18 U.S.C. § 1962(d) .................................................................................................19, 22

*William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008*, Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067 (2008) ...................................................28

Wis. Stat. § 946.82(2) ..................................................................................................25

Wis. Stat. § 946.82(3) ..................................................................................................26

Wis. Stat. § 946.83(3) ..................................................................................................25

LEGISLATIVE MATERIALS

H.R. Rep. No. 108-264, pt. 2 (2003)..............................................................................29

OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 6

Plaintiff Irma Martinez ("Ms. Martinez"), by her attorneys, hereby responds to Defendants Jefferson N. Calimlim ("Jefferson Sr.") and Elnora M. Calimlim's ("Elnora") (collectively, the "Parent Defendants") Motion to Dismiss Counts I-IV and to Stay Counts V-VI. For the reasons set forth below, the Parent Defendants' motion should be denied in its entirety.

## INTRODUCTION

On May 26, 2006, a Milwaukee federal jury convicted the Parent Defendants, both physicians, of conspiracy to commit forced labor,[1] forced labor,[2] and attempted forced labor.[3] The jury also convicted the Parent Defendants, along with their eldest son, Jefferson M. Calimlim, of harboring an undocumented alien for private financial gain.[4] The jury determined that the Parent Defendants held the victim, Ms. Martinez, in a condition of servitude for nineteen years, forcing her to work long hours as a domestic servant for the Calimlim family and subjecting her to threats of serious harm and physical restraint. The Seventh Circuit upheld the Parent Defendants' convictions on August 15, 2008, remanding the case back to the trial court for additional sentencing enhancements.[5] The Parent Defendants are currently incarcerated, each serving a four year prison term in federal prison.[6]

Relying in part on the Calimlims' prior criminal convictions for the required predicate acts, on September 25, 2008, Ms. Martinez filed this action seeking damages for the injuries she suffered as a trafficking victim imprisoned by the Parent Defendants and their three children in the Calimlim family's Milwaukee mansion. The Parent Defendants have moved to dismiss Counts I-IV under Fed. R. Civ. P. 12(b)(6).

---

[1] 18 U.S.C. § 371 (conspiracy to commit forced labor).
[2] 18 U.S.C. § 1589 (forced labor).
[3] 18 U.S.C. § 1594 (attempted forced labor).
[4] 8 U.S.C. § 1324 (harboring an undocumented alien).
[5] *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008), *cert. denied*, __ S. Ct. __, No. 08-634, 2009 WL 56256 (U.S. Jan. 12, 2009).
[6] Jefferson Jr. was sentenced to 120 days of home confinement, three years of supervised release, and a $5,000 fine.

This gambit must fail. Ms. Martinez's Complaint provides more than enough factual material, all of which must be accepted as true for the purposes of these pleadings, to show that these defendants used their family unit to commit and conceal a long pattern of criminal acts over nineteen years, including harboring Ms. Martinez, holding her in involuntary servitude, preventing her escape, and extracting her unpaid labor.

Finally, in an effort to delay these proceedings, the Parent Defendants also have moved to stay Counts V and VI. These civil claims for trafficking and forced labor under 18 U.S.C. § 1595, should, in light of the criminal convictions, proceed to a damages assessment. The Parent Defendants' liability for damages under 18 U.S.C. § 1589 has already been established by the underlying criminal convictions. The Parent Defendants' effort to misuse 18 U.S.C. § 1595(b)(1), a statutory provision designed to protect the integrity of criminal investigations and prosecutions, should not be permitted to derail these proceedings.

Throughout their motion to dismiss, the Parent Defendants whitewash the facts and distort the law. The motion to dismiss refers throughout to minor children and "kids," positing that the Calimlim children remained suspended in time, their ages forever frozen at 5, 8, and 11. (Def.'s Mot. 2, 7.) But the children did reach adulthood and committed affirmative *predicate* acts to continue Ms. Martinez's imprisonment as a virtual slave in their home. Indeed, Jefferson Jr., the eldest of the Children Defendants, was *convicted* of alien harboring. The other siblings knowingly facilitated the scheme. The Parent Defendants ignore entirely the role played by Dr. Jovito Mendoza and Mrs. Bending Mendoza, Elnora's parents and members of the Calimlim Family's "Trafficking and Alien Harboring Enterprise" (the "Calimlim Family Enterprise"), in recruiting Ms. Martinez, fraudulently obtaining a U.S. visa in the Philippines, and then trafficking her into the United States.

Moreover, the Parent Defendants' cursory arguments that a nuclear family cannot be an association-in-fact RICO enterprise, (Def. Mot. 7), fail. In an area of law laden with named family enterprises, the notion that a three-generation family lacks "the family and social relationships" that help define a criminal RICO enterprise, *United States v. Leisure*, 844 F.2d 1347, 1363 (8th Cir. 1988), cannot prevail. And the defense that the case relies entirely on mail and wire fraud, pled with "insufficient particularity," ignores that there are multiple *convictions* for multiple predicate acts in this case. The mail and wire fraud claims are, in a manner of speaking, mere frosting on the cake.

Dodging the substance of Ms. Martinez's allegations, the Parent Defendants argue that Ms. Martinez alleges mere "facts describing household activity," (Def.'s Mot. 5), which the Parent Defendants claim are not actionable under RICO. In fact, Ms. Martinez details how the Calimlim Family's "household activities" included trafficking Ms. Martinez into the United States, forcing her to work around the clock without pay, harboring her for personal financial gain, purposely allowing her visa to lapse, and concealing her presence in the home to permit their fraudulent scheme to continue indefinitely. That the Calimlims consider such activities part-and-parcel of their family activities simply reinforces the applicability of civil RICO to their criminal conduct.

## BACKGROUND

For purposes of the motion to dismiss, the factual allegations in the Complaint must be accepted as true. As noted above, many of these allegations already have been proven beyond a reasonable doubt in the successful criminal case against the Parent Defendants and Jefferson Jr. Ms. Martinez's Complaint describes in detail the role each defendant played in these crimes. It further outlines the Parent Defendants' concerted efforts over nineteen years to hold Ms.

Martinez in conditions of forced labor, using their family as an enterprise to commit these federal crimes.

The Parent Defendants trafficked Ms. Martinez into the United States in July of 1985. (Compl. ¶¶ 4, 13, 32.) They enlisted the help of Elnora's parents, Dr. Jovito Mendoza and Mrs. Bending Mendoza (the "Mendozas"), who resided in the Philippines and for whom Ms. Martinez had worked as a live-in housekeeper. (Compl. ¶ 25.) Dr. Mendoza spent years trying to convince Ms. Martinez to move to the United States to work for Jefferson Jr. and Elnora. (Compl. ¶¶ 26-28.) Dr. Mendoza was able to lure Ms. Martinez to the United States with a plane ticket, a fraudulent visa, and promises that she would work as a babysitter, earning a substantial amount of money. (Compl. ¶¶ 28, 31, 114.e.)

When Ms. Martinez landed in the United States, Jefferson Sr. and Elnora confiscated her passport and immediately put her to work. (Compl. ¶ 33.) Ms. Martinez was just nineteen years old and unable to speak English. (Compl. ¶ 34.) Taking advantage of her vulnerable position, the Parent Defendants informed Ms. Martinez upon arrival that she owed a debt to the family for the plane ticket she had used to travel to the United States. (Compl. ¶ 33.) Rather than babysitting, they forced Ms. Martinez to work in their residences, office, and investment property — for sixteen to seventeen hours every day of the week. (Compl. ¶¶ 37-39.) Her tasks were wide-ranging — from bringing Elnora fresh towels after her showers, to cleaning the seven-bedroom mansion, to washing and waxing defendants' multiple cars at least once per week. (Compl. ¶¶ 40, 46.) When Ms. Martinez did not perform these tasks to the defendants' standards, Jefferson Sr. subjected her to physical and verbal abuse. (Compl. ¶ 40.)

Upon her arrival in the United States, Elnora and Jefferson Sr. informed Ms. Martinez that, contrary to promises conveyed by Dr. Mendoza, she would only earn $100 per month.

(Compl. ¶ 35.a.)  But Jefferson Sr. and Elnora failed to pay Ms. Martinez even this illegally low wage. (Compl. ¶ 43.e.)  And although Elnora opened a bank account on August 22, 1985, purportedly to deposit Ms. Martinez's wages, Elnora never deposited any wages in such an account. (Compl. ¶¶ 35.d, 114.e.)  Similarly, despite promises to do so, Jefferson Sr. and Elnora failed to send Ms. Martinez's "salary" to her parents in the Philippines.  Throughout her nineteen-year captivity, the total amount of money transferred to her family was only $18,000, a fact that Ms. Martinez did not learn until Jefferson Sr., Elnora, and Jefferson Jr.'s criminal trial. (Compl. ¶ 35.a-c.)

Elnora and Jefferson Sr., along with the Children Defendants, took extraordinary measures to conceal Ms. Martinez's presence from outsiders.  For example, Jefferson Sr. and Elnora developed an elaborate telephone signaling system to ensure that Ms. Martinez was available to field the defendants' calls without the risk of being discovered by outsiders. (Compl. ¶ 73.) And Ms. Martinez was only permitted to answer the door of the $1.2 million mansion once — on Halloween, when she wore a mask to conceal her identity. (Compl. ¶ 68.c.)  These schemes continued until September 29, 2004, when U.S. government agents rescued Ms. Martinez from the Calimlim mansion after receiving a tip from Jack's ex-wife, Sherry Bantug. (Compl. ¶¶ 97, 98.)  When federal agents arrived at the Calimlim home, Jefferson Jr. lied, stating that he had not seen Ms. Martinez for more than one year and did not know where she was. (Compl. ¶100.)  After an extensive search of the six-bedroom, seven-bathroom mansion, federal agents found Ms. Martinez cowering in a basement bedroom closet, trembling with fear. (Compl. ¶ 101.)

## ARGUMENT

### I. Applicable Legal Standard

When ruling on a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), "a judge must accept as true all of the factual allegations contained in the Complaint." *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam). All inferences must be drawn in favor of the nonmovant. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2431 (2008). Plaintiff's claims need only "have some degree of plausibility to survive dismissal." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). A complaint should not be dismissed unless "the factual detail . . . [is] so sketchy that the [c]omplaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).[7]

### II. Ms. Martinez Alleges Cognizable Federal RICO Claims.

The Parent Defendants argue that Ms. Martinez's RICO claim in Count I, under Section 1962(c), should be dismissed because (1) the Calimlim Family is not a RICO enterprise, or (2) there is no pattern of racketeering, or (3) Ms. Martinez has not pled the predicate act of fraud with enough particularity. Their arguments fail. *First*, Ms. Martinez adequately alleges that the Calimlim family is a RICO enterprise. *Second*, Ms. Martinez's allegations of multiple predicate

---

[7] The Parent Defendants insinuate that the Complaint is "threadbare" and that this case is likely to entail costly "big case" discovery. That simply is not true – discovery is, with a few exceptions, substantially complete. The Parent Defendants were convicted of obtaining and conspiring to obtain forced labor, and harboring and conspiring to harbor an alien for private financial gain. Their trial did not merely adjudicate their guilt for the crimes alleged in Ms. Martinez's Complaint; they developed a rich evidentiary record that Ms. Martinez should be "entitled to offer . . . to support [her civil] claims." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1981 (2007) (quotation marks omitted). Moreover, by virtue of that criminal trial, the Defendants already have within their control all relevant evidence relating to Ms. Martinez's nineteen years of imprisonment and forced labor in their homes and properties. And although Jefferson Sr. and Elnora are currently serving sentences in federal prison for these crimes, their legal counsel in this matter need do little more than unearth the files created for their criminal trial.

criminal acts over *nineteen years* of continuous involuntary servitude qualify as a pattern of racketeering. *Finally*, Ms. Martinez has pled fraud with particularity.

A.     **Ms. Martinez Alleges a RICO "Enterprise."**

Calling the parent/child relationship a "biologic phenomenon," the Parent Defendants argue that nuclear families "lack the structure, common purpose and course of conduct required for an 'association-in-fact' enterprise." (Def.'s Mot 8.) That could not be farther from the truth — or the law.

A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *see also Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (noting that an enterprise is "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making") (quotation marks omitted). Association-in-fact enterprises must have "some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much." *Burdett v. Miller*, 957 F.2d 1375, 1379 (7th Cir. 1992).[8]

The Supreme Court has described three sub-elements that must be proven to prevail on the enterprise prong in a RICO action. *United States v. Turkette*, 452 U.S. at 583-84. First, the enterprise must be an ongoing organization with a decision-making structure. Second, the associates must function as a continuing unit. Finally, the enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *Id.* The three generation Calimlim

---

[8] On January 14, 2009, the Supreme Court heard arguments in *Boyle v. United States*, No. 07-1309. The Court granted *certiorari* to address a circuit split on the issue of whether an association-in-fact enterprise must have some ascertainable structure apart from that inherent in the acts of racketeering. *Boyle v. United States*, 129 S. Ct. 29 (2008) (mem.).

family, described in the Complaint as the "Trafficking and Alien Harboring Enterprise," (Comp. ¶ 6), fully satisfies these criteria.

*First*, the Parent Defendants are simply wrong in arguing that a nuclear family has never been found to constitute an enterprise for RICO purposes. (Def.'s Mot. 7.)  *See In re Crazy Eddie Sec. Litig.*, 812 F. Supp. 338, 354 (E.D.N.Y. 1993) (holding that an association-in-fact enterprise consisting of members of the Antwar family constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4)); *Jane Doe I v. Reddy*, No. 02-05570, 2003 WL 23893010 (N.D. Cal. Aug. 4, 2003) (finding that a family and its businesses constituted an enterprise engaged in trafficking for forced labor); *Vega v. Contract Cleaning Maint., Inc*., No 03C9130, 2004 WL 2358274 (N.D. Ill. Oct. 18, 2004) (finding allegations that members of the nuclear family and its corporate entities formed an association-in-fact sufficient to deny motion to dismiss);  *Lumbermans Mut. Casualty Ins. Co. v. Maffei,* No. 3:03-CV-00262-JWS, 2006 WL 2032607 (D. Alaska July 18, 2006) (rejecting a motion to dismiss and finding a husband and wife, their family companies, and their attorney constituted an association-in-fact enterprise); *Tabas v. Tabas*, 47 F.3d 1280, 1285-86 (3d Cir. 1995) (describing enterprise involving father, children, and son-in law); *Am. Manufs. Mut. Ins. Co. v. Townson*, 912 F. Supp. 291, 295 (E.D. Tenn. 1995) ("[M]arriage can be an 'enterprise' under RICO.  In a marriage, a man and a woman are associated together for the common purpose of engaging in a course of conduct necessary to preserve their welfare as a marital unit.").

The association-in-fact enterprise described in the Complaint, an otherwise normal-looking family, is an ongoing organization with a long-standing decision-making structure.  The patriarch of the family, Jefferson Sr., in concert with his wife Elnora, made the decisions for the family enterprise and supervised implementation. (Compl. ¶¶ 20, 83-84, 110, 112.)  Jefferson Sr.,

"like a godfather at the apex of a mob, served as the patriarch of the family and was the ultimate decisionmaker." *Jane Doe I v. Reddy*, 2003 WL 23893010, at * 5. The Parent Defendants, led by Jefferson Sr., dictated the enterprise's activities. Jefferson Sr. enforced his will on the entire family with physical violence and a terrifying temper. (Compl. ¶¶ 40, 84-86, 110, 112.) Each member of the Calimlim family, including the grandparents in the Philippines, played a role in this structure, engaging in a secretive pattern of racketeering activity designed to lock in Ms. Martinez's involuntary labor and prevent her escape. Securing Ms. Martinez's involuntary labor took discipline. Each member of the enterprise took elaborate measures to conceal her presence, and each member performed specific roles. (Compl. ¶¶ 26 -31, 35, 70-81.)

In the Philippines, the Mendozas followed Jefferson Sr. and Elnora's instructions to procure a fraudulent visa and facilitate Ms. Martinez's travel to the United States. Elnora's parents served as the traffickers. In the United States, the Parent Defendants — particularly Jefferson Sr. — developed the standard operating procedures and rules by which the enterprise operated. The Children Defendants abided by those rules well into adulthood and took all necessary steps to ensure that the enterprise met its core goal and common purpose: permanently securing Ms. Martinez's involuntary labor. The Parent and Children Defendants jointly enjoyed the fruits of the enterprise: free labor.

*Second*, the Calimlim Family Enterprise functioned as a continuing unit. The Parent Defendants ran their family, including their children and Elnora's parents, the Mendozas, as a criminal enterprise. But the family members also remained closely associated to conduct activities beyond the scope of their criminal undertaking. The Calimlim family lived together, traveled together, and kept in close contact with one another, including the Mendoza grandparents in the Philippines. (Compl. ¶ 112.) Even after Dr. Mendoza's death in 1993, the

family continued to function as a unit. (Compl. ¶ 21.) Phone calls, letters, and contacts with the Mendoza grandparents for the legitimate purpose of updating the family in the Philippines on the grandchildren's activities in the United States occurred before and after Dr. Mendoza's death. Those same contacts over a nineteen-year period facilitated the transfer of Ms. Martinez's fraudulent "wages" to her impoverished family in the Philippines. (Compl. ¶ 112.)

*Third*, because the Calimlim family did, in fact, exist and function as a family, there is no merit to the Parent Defendants' assertion that the enterprise in this case is nothing more than the sum of the predicate acts alleged. *See Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990). The Calimlim family has an "ascertainable structure distinct from that inherent in the conduct of this pattern of racketeering activity," that is, the pattern of mail and wire fraud, trafficking, alien harboring, and forced labor offenses. *United States v. Flynn*, 852 F.2d 1045, 1051 (8th Cir. 1988) (internal citation and quotation marks omitted). "This structure is found in the family and social relationships between the members of the group." *Id.* And the inclusion of the Mendozas in the enterprise does not render the enterprise "indistinguishable from the alleged pattern of racketeering activity" as the Parent Defendants claim. The grandparents were always part of the family, completely apart from their shared criminal enterprise.

The Parent Defendants argue that the enterprise is not a RICO association-in-fact because the Children Defendants did not choose to join the Calimlim family. (Def.'s Mot. 8.) This argument misses the point. The Children Defendants' membership in the Calimlim family is not the issue; the issue is that *even as adults* the Children Defendants actively participated in an enterprise, the aim of which was to harbor Ms. Martinez for the purpose of securing her involuntary labor.[9]

---

[9] The Parent Defendants argue that their nuclear family lacks the requisite enterprise structure, in part, because their family operated the way all families operate, which is the natural order of things. (Def.'s Mot. 8.) This argument is

## B. Ms. Martinez Alleges a Pattern of Racketeering Activity.

The Parent Defendants are also wrong when they contend that Ms. Martinez fails to allege a pattern of racketeering activity. (Def.'s Mot. 9.) A "pattern of racketeering activity," is defined as the commission of at least two predicate acts within a ten-year time period. 18 U.S.C. § 1961(5). The Supreme Court has required "continuity plus relationship" among the various acts of racketeering activity to constitute a pattern. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (quotation marks omitted). The Parent Defendants concede that there is "no question that the alleged predicate acts are related." (Def.'s Mot. 10.) Defendants assert, however, that Ms. Martinez's Complaint fails to satisfy the continuity prong of RICO. Their argument — that Ms. Martinez is but "a single victim, claiming discrete injuries from a discrete transaction" (Def.'s Mot. 11) — fails.

The Parent Defendants' argument rests almost entirely on the untenable proposition that Ms. Martinez's allegations of multiple, significant, and separate injuries over the nearly two decades she suffered under their control somehow can be interpreted as a "single transaction." (Def.'s Mot. 11.) Citing no authority, the Parent Defendants argue that three of the predicate acts alleged — trafficking, harboring, and forced labor — "cannot be viewed as separate transactions." (*Id.*) They are wrong on two counts. First, "distinct statutory violations . . . will be considered to be distinct irrespective of the circumstances under which they arose." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277 (11th Cir. 2006). Trafficking, alien harboring, and forced

---

unpersuasive. In the quintessential RICO case — a business captured by the Mafia — the Mafia members running the "family" establish procedures that family members, both related and recruited, follow. Indeed, the major RICO cases have involved "families," featuring close relatives as individual defendants. *United States. v. Persico*, 832 F.2d 705 (2d Cir. 1987) (describing father-son enterprise); *United States. v. Matera*, 489 F.3d 115 (2d Cir.) ("crime family case"), *cert. denied*, 128 S. Ct. 424 (2007); *United States. v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (same); *United States. v. Ferguson*, 758 F.2d 843 (2d Cir. 1985) (enterprise called "The Family").

labor are separate predicate acts and separate crimes.[10]  In *Williams*, the court found a pattern of racketeering activity where plaintiffs alleged violations of three sub-sections of one of the statutes alleged here:  8 U.S.C. § 1324, governing harboring of aliens.  *Id.*  Second, the "repeated infliction of an economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity."  *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 524 (7th Cir. 1995); *Appley v. West*, 832 F.2d 1021, 1027-28 (7th Cir. 1987).  The Parent Defendants' argument that trafficking, harboring, and forced labor "are the means through which the solitary scheme to recruit the plaintiff for employment as a domestic worker was carried out" misses the mark.  (Def.'s Mot. 11.)  "[T]he fact that there is but one objective underlying the separate acts does not diminish the applicability of RICO to those acts." *United States v. Starnes*, 644 F.2d 673, 678 (7th Cir. 1981).  In *Starnes*, the Seventh Circuit rejected an argument strikingly similar to the one Parent Defendants attempt to assert.  There, defendants argued that acts indictable under laws prohibiting arson, mail fraud, and interstate travel with intent to commit arson failed to constitute a pattern of racketeering activity in the scheme to defraud an insurer.  *Id.* at 677-78.  In affirming the finding that each act was a separate act of racketeering, the Seventh Circuit held that "[w]hile there may indeed have been a single scheme or objective of the conspiracy [the arson] it turned out that several acts of racketeering were contemplated to achieve that objective." *Id.* at 678.  So too, in this case.  The Parent Defendants' arguments must fail.

Ms. Martinez alleges substantially more than two distinct and separate predicate acts of criminal activity.  And her *nineteen years* of involuntary servitude certainly meets the continuity

---

[10] Those engaging in trafficking need not also harbor aliens. The Calimlims might have maintained Ms. Martinez's legal status in the United States, thereby obviating the need to commit alien harboring.  Finally, the Calimlims might have paid Ms. Martinez a legal wage, preventing their convictions for forced labor.  Each one of these separate decisions required a separate set of acts and undergirded a separate crime; these predicate acts do not merge into one.

requirement under RICO. *Jennings v. Auto Meter Prods., Inc.,* 495 F.3d 466, 473-74 (7th Cir. 2007) ("The duration of the alleged racketeering activity is perhaps the most important element of RICO continuity.") (internal quotation marks omitted).

The mere fact that the Calimlim Family Enterprise trafficked only one victim into the United States for forced labor is not fatal to Ms. Martinez's claims. *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir. 1986), upon which Elnora and Jefferson Sr. so selectively rely, did not adopt the simplistic rule that these defendants now recite. The court in *Morgan* explicitly stated that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Id.* at 975-76. Indeed, multiple cases in this Circuit have found a pattern of racketeering activity, even in instances involving one victim and a single scheme. *See Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1305 (7th Cir. 1987) ("[T]he repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO."); *Uniroyal Goodrich Tire Co.*, 63 F.3d at 523 ("the existence of a single victim does not preclude the existence of a pattern of racketeering activity"); *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 963 (7th Cir. 1996) ("[T]he various predicates of mail and wire fraud occurred repeatedly over a period as long as three years and each scheme, though inflicted upon the same victim, caused separate and distinct injuries"); *Hinsdale Women's Clinic, S.C. v. Women's Health Care of Hinsdale*, 690 F. Supp. 658 (N.D. Ill. 1988) (single victim and single scheme sufficient to prove pattern of racketeering activity).[11]

---

[11] While a single victim is sufficient in this Circuit to allege a pattern of racketeering activity, the Calimlim family's predicate acts and crimes harmed a large number of victims outside of the United States. As alleged in the Complaint, ¶¶ 28, 35(b) & (g), Ms. Martinez accepted the Calimlim's fraudulent job offer in order to remit money home to her parents and other family members. Like a corporate victim unable to pay commissions to employees due to defendants' fraud, Ms. Martinez was unable to satisfy promises that she had made to her family to provide material support from her wages. *See Bankcard Am. Inc. v. Universal Bancard Sys. Inc.*, 904 F. Supp. 753, 760-61

Like the single victims in *Hinsdale*, *Uniroyal*, and *Liquid Air*, Ms. Martinez has suffered significant and separate injuries caused by the wide variety of predicate acts and crimes committed by the Calimlim Family's Trafficking and Alien Harboring Enterprise and the individual defendants. Ms. Martinez suffered a separate cognizable injury on multiple occasions: when she was tricked by the Parent Defendants and the Mendozas into moving to the United States; when the Parent Defendants and the Mendozas procured a fraudulent visa for her in Manila; when the Parent Defendants trafficked her to the United States, robbing her of any opportunity to earn a reasonable salary in her home country; when Elnora opened a bank account for her in the United States with no intention of depositing any of her paltry earnings; when the Children Defendants took affirmative steps to conceal her from the outside world; when the Parent Defendants refused to permit her to seek medical or dental care; when the Parent Defendants defrauded her of her salary using the mail and the wires; when the Parent Defendants wired money to the Philippines under the auspices of sending her parents a pittance they claimed was her salary; and when all the defendants threatened her into believing that she could not leave their home. In short, Ms. Martinez has alleged a host of predicate acts. The defendants' contention that Ms. Martinez suffered injuries from a "discrete transaction" is simply in error.

### C. Ms. Martinez Alleges Predicate Acts of Wire Fraud and Mail Fraud With Sufficient Particularity.

The Parent Defendants' argument that Ms. Martinez's mail and wire fraud allegations lack sufficiency is without merit. There are three elements to establishing wire or mail fraud as a predicate act under RICO: "(1) a scheme to defraud, (2) an intent to defraud, and (3) the use of the mails or wires in furtherance of the scheme." *United States. v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006) (citing *United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004); *United States*

---

(N.D. Ill. 1995) (treating case as multi-victim case where corporations could not pay employees as a result of the defendant's scheme).

*v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002)), *cert. denied*, 128 S. Ct. 46 (2007).  A scheme to defraud is "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises . . . . by trick, deceit, chicane or overreaching." *Carpenter v. United States,* 484 U.S. 19, 27 (1987) (citations omitted).  Intent to defraud requires a "willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002).

The communication at issue need not contain false or misleading information or to create pecuniary loss. *United States v. Brocksmith*, 991 F.2d 1363, 1367-68 (7th Cir. 1993).  A plaintiff only needs to show that the use of the mails or wires was an essential element of the purported scheme.  *United States v. Walters*, 997 F.2d 1219, 1222 (7th Cir. 1993) (citing *Pereira v. United States*, 347 U.S. 1, 8 (1954)); *see also Schmuck v. United States*, 489 U.S. 705, 710 (1989) (explaining that federal mail fraud statute reaches instances in which the "use of the mails is a part of the execution of the fraud") (quotation marks omitted).

The Parent Defendants argue that Ms. Martinez's RICO claim should be dismissed because she has failed to plead any allegations of mail and wire fraud with sufficient particularity.  (Def.'s Mot. 13.)  As shown below, that argument should be rejected.

- ***Acts of Wire Fraud to Obtain Ms. Martinez's Forced Labor.***  Ms. Martinez specifically alleges that in May and June of 1985, Jefferson Sr. and Elnora used international phone calls with Dr. Mendoza to make logistical arrangements to traffic Ms. Martinez into the United States, including obtaining a plane ticket and securing a visa. (Compl. ¶ 114.e.)  Ms. Martinez alleges that, as a result of those conversations, international transmissions were made between the U.S. Embassy in the Philippines and the U.S. State Department in Washington, D.C.

(Compl. ¶ 114.e.) For the purposes of the fraud statutes, Parent Defendants "caused" these transmissions because they were a "reasonably foreseen" consequence of securing the visa. *See Pereira v. United States*, 347 U.S. 1, 8-9 (1954); *United States v. Ratliff-White*, 493 F.3d 812, 818 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1070 (2008). Both sets of transmissions — those to orchestrate logistics and those to secure the visa — were done with the specific intent of tricking Ms. Martinez into migrating to the United States to perform forced labor. (Compl. ¶ 114.e.) The Parent Defendants' use of wires to traffic Ms. Martinez into the United States was "surely instrumental to [the] scheme; indeed, it *was* the scheme." *Brocksmith*, 991 F.2d at 1367 (emphasis in original).

• ***Acts of Wire Fraud to Conceal Ms. Martinez's Forced Labor.*** Ms. Martinez also specifically alleges that the Parent Defendants forced her to use a telephone signaling system under which she was only able to answer the home phone after ten rings. This pattern, used on a daily basis, signaled to her that one of the defendants was calling, and not an outsider. (Compl. ¶ 73.) The Parent Defendants violated the wire fraud statute each time they, the Children Defendants, or another party phoned the Calimlims from out-of-state or from a cellular phone. *See United States v. Mitra*, 405 F.3d 492, 496 (7th. Cir. 2005) (recognizing that all cell-phones are a part of interstate commerce).[12] By virtue of the defendants' fraudulent scheme, and

---

[12] Ms. Martinez need not identify specific instances of international or cellular phone calls, since the court may infer inter-state wire transmissions in this situation. *Cf. Olympic Fed. v. Remp*, No. 87C8705, 1998 WL 64410, *6 (N.D. Ill. June 16, 1998) (inferring interstate telephone calls made in furtherance of a scheme to defraud where corporations were located in different states). Indeed, in light of the Defendants' frequent communications with the Mendozas in the Philippines, (Compl. ¶ 112.b), it is more than reasonable to infer that, during this nineteen-year period, the Calimlims received at least one out-of-state call. Further, because the signaling system was designed to permit the Parent Defendants to dial-in labor requests and other instructions to Ms. Martinez while they were out of the house, there is every reason to believe that they did so by mobile phone, particularly in the later years. Origin of incoming calls cannot be known without discovery; there is no way for Ms. Martinez to know whether the Defendants' service requests were made from cellular phones and obviously no way for her to know the origin of calls from outsiders, which, by virtue of the signaling system, she was not even permitted to answer. *See Emery v. Am. Fin., Inc.*, 134 F.3d 1321 (7th Cir. 1998) (recognizing that plaintiff bringing mail and wire fraud claims should not be punished for her "inability to obtain essential information without pretrial discovery").

through the use of the wires, Ms. Martinez remained trapped in servitude for two decades. (Compl. ¶ 43.e.)

- ***Acts of Wire Fraud and Mail Fraud to Transfer Ms. Martinez's "Wages."*** Ms. Martinez specifically alleges that the Parent Defendants forced her to send financial information in her letters to her parents in the Philippines. (Compl. ¶ 114.d.) Martinez's parents presented these letters for payment to the Mendozas. (Compl. ¶ 114.d.) At Jefferson Jr. and the Parent Defendants' criminal trial, the evidence revealed that Ms. Martinez's parents had in fact received only $18,000 during her nineteen-year captivity. (Compl. ¶ 35.a, 114.d.) Ms. Martinez alleges, on information and belief, that each payment was authorized by international communications by phone or mail between the Parent Defendants and the Mendozas. (Compl. ¶¶ 114.e.) By using the mail to send Ms. Martinez's parents financial information in their daughter's own handwriting, the defendants were able to keep her parents at bay, concealing the Parent Defendants' scheme to defraud Ms. Martinez and the entire Martinez family. *Cf. United States v. Turner*, No. 07-1062, __ F.3d __, 2008 WL 5396836, at *10 (7th Cir. Dec. 30, 2008) (holding that use of the mails to lull victims into a false sense of security violates the mail fraud statute).

Elnora Calimlim further used the wires to defraud Ms. Martinez by opening a bank account on August 22, 1985 and closing that account on June 22, 1987, just two days after she allowed Ms. Martinez's visa to lapse. (Compl. ¶ 114.e.) The act of opening a bank account also triggered wire communications between the branch where Elnora opened the account and the bank's headquarters. The existence of the account was to provide a veneer of legitimacy to the Parent Defendants' scheme, all in furtherance of their fraud.

As demonstrated above, Ms. Martinez has demonstrated sufficiently specific acts of mail and wire fraud to survive a motion to dismiss. The Parent Defendants fail to acknowledge that

"Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim." *Corley v. Rosewood Care Ctr.*, 142 F.3d 1041, 1051 (7th Cir. 1998). A civil RICO plaintiff, like others, may allege circumstances surrounding mail or wire fraud "on information and belief" in situations where "facts [are] inaccessible to he plaintiff." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir. 1992) (internal quotation marks omitted). As Judge Posner has explained, even in RICO cases, the court must refrain from creating a "Catch-22 situation in which a complaint is dismissed because of the plaintiffs' inability to obtain essential information without pretrial discovery." *Emery v. Am. Gen. Fin. Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998).

Ms. Martinez cannot know some facts, such as information about when wire transmissions occurred between the U.S. Embassy and the Department of State, or between a bank branch and the headquarters, or even between the Calimlims and the Mendozas. She was not a party to these communications. *See Corley*, 142 F.3d at 1050-51 (recognizing that plaintiff is most likely to lack information about fraudulent communications with third-parties); *Uni\*quality, Inc. v. Infotronix, Inc.*, 974 F.2d 918 (7th Cir. 1992) (same). Likewise, Ms. Martinez cannot know or plead the dates that any letters were diverted from the U.S. postal service. *See, e.g., Hinsdale Women's Clinic, S.C.*, 690 F. Supp at 660-61 (refusing to dismiss RICO claim that failed to allege dates of mailings where dates were presently unknown). Ms. Martinez, like other civil RICO plaintiffs, cannot be punished for failing to plead the dates or contents of each of the defendants' acts of mail and wire fraud, because that information is peculiarly within the Parent Defendants' control and inaccessible to her without pre-trial discovery. *See Ash v. Wallenmeyer*, 879 F.2d 272 (7th Cir. 1989).

Ms. Martinez also cannot be expected to know which role each defendant played in a particular act of mail or wire fraud. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994). Because Ms. Martinez "may not [be] privy to the particular individuals responsible for the letters, telephone calls" of the defendants' fraudulent scheme, she must be excused from the requirement of identifying each individual's role with specificity. *Id.* at 1329 (citing *P & P Marketing, Inc. v. Ditton*, 746 F. Supp. 1354, 1362 (N.D. Ill. 1990)). Dismissing Ms. Martinez's Complaint for failure to identify the precise role of each "insider" in the defendants' criminal enterprise would defy controlling precedent. No doubt the Complaint fairly informs each defendant of his or her role in the scheme.

## III. Ms. Martinez Alleges a Cognizable RICO Conspiracy.

The Court should also reject the Parent Defendants' motion to dismiss Ms. Martinez's RICO conspiracy claim in Count II. Under 18 U.S.C. § 1962(d), it is unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." *Id.* To state a claim for RICO conspiracy, the plaintiff must prove that "the defendant was aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008). To properly allege a RICO conspiracy, the complaint must allege facts supporting the existence of an agreement to "knowingly . . . perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000). Direct evidence of that agreement need not be alleged nor ultimately proven as "'an agreement can be inferred from the circumstances.'" *United States v. Stephens*, 46 F.3d 587, 592 (7th Cir. 1995) (quoting *United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir. 1986)).

The Parent Defendants argue, first, that Ms. Martinez fails to state a RICO conspiracy claim because Count I of the Complaint does not adequately allege a violation of 18 U.S.C. §

1962(c). Plaintiff has already refuted this argument. Second, the Parent Defendants argue the Complaint does not adequately allege their children's agreement to participate in the affairs of the racketeering enterprise.

At the outset, it is important to note what the Parent Defendants are not arguing: assuming a properly pled claim for violation of section 1962(c) in Count I, Jefferson Sr. and Elnora do not contest the adequacy of the Complaint's allegations as to their own agreement to participate in the racketeering enterprise, nor do they contest the sufficiency of the allegations that they committed predicate acts of trafficking, forced labor, and alien harboring. Because they effectively concede the adequacy of the allegations regarding their own agreement and joint action, the Parent Defendants' motion to dismiss Count II must be denied. *Cf. United States v. Avila*, 465 F.3d 796, 798 (7th Cir. 2006) ("[A] conspiracy . . . requires concerted action by at least two people.").

Instead of addressing their own conspiracy liability, the Parent Defendants attempt to shift focus to the Children Defendants' conduct. Although the Parent Defendants may be liable for conspiring with one another and the Mendozas without regard to the Children Defendants' conspiracy liability, the arguments regarding their children also fail.

In asserting that the Complaint does not adequately spell out their children's agreement to participate in the conspiracy, the Parent Defendants ignore the fact that an agreement to participate in a RICO conspiracy, as with any conspiracy, can be implied. *See Stephens*, 46 F.3d at 592. Moreover, to state a claim for RICO conspiracy against the Children Defendants, the

Complaint does not have to allege that they personally committed any predicate acts — "it is enough that one agree that someone commit the predicate acts." *Brouwer*, 199 F.3d at 964.[13]

That the Children Defendants were aware of the general scope of the Trafficking and Alien Harboring Enterprise and intended to support and participate in it is amply alleged in the Complaint. *Useni*, 516 F.3d at 646. It asserts that Jefferson Jr., Jack, and Christina continued to force Ms. Martinez to work against her will when they returned home as adults. (Compl. ¶ 56.) The Complaint outlines the extreme and repeated steps that all three children took to conceal Ms. Martinez's presence in their home — from never disclosing her existence to outsiders, to forcing her to duck out of sight when traveling by car, to establishing a separate phone line for her and using a ten-ring code before she could answer the main phone. (Compl. ¶¶ 60, 71 & 73); *see United States v. Townsend*, 924 F.2d 1385, 1395 n.5 (7th Cir. 1991) ("The use of a common code by all of the defendants may support an inference that they conspired together."). Allegations further illustrating the children's support of and participation in the trafficking and forced labor scheme include that Jack lied to the woman who ultimately became his wife to try to pass Ms. Martinez off as a relative. Similarly, Christina instructed Ms. Martinez to hide when her friends came over to the house. (Compl. ¶¶ 76, 78.) The Complaint alleges Jack and Christina participated in Ms. Martinez's captivity by frequently telling her that her immigration status meant that she was powerless to leave or return to the United States. (Compl. ¶ 79.) Jefferson Jr. lied to federal agents about Ms. Martinez's presence in the home. (Compl. ¶ 100.) Without the Children Defendants' participation in and agreement to the conspiracy, it simply would not have been possible for Jefferson Sr. and Elnora to have held Ms. Martinez in captivity for nineteen years. Drawing all inferences in Plaintiff's favor, there can be no question that these allegations

---

[13] Although the facts alleged in the Complaint clearly meet the *Brouwer* standard, the Complaint goes well beyond this standard in alleging — correctly and properly — that the Children Defendants actually committed acts of forced labor and alien harboring. (*See* Compl. ¶ 120.)

support the inference that the Children Defendants "knowingly agree[d] to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." *Brouwer*, 199 F.3d at 967.

The fact that the Children Defendants were young and not yet acting as members of the conspiracy when Ms. Martinez was first trafficked into their home is not a bar to Section 1962(d) liability for them or their parents. The existence of a conspiracy is not disproved merely because its membership or the roles played by its participants change over time. *United States v. Shorter*, 54 F.3d 1248, 1255 n.14 (7th Cir. 1995) ("As long as the conspiracy continues toward its goal to achieve a common objective, it remains a single conspiracy despite the fact that participants may change or perform different roles or functions at different times.") (quotation marks omitted); *United States v. Bello-Perez*, 977 F.2d 664, 668 (1st Cir. 1992) ("What was essential is that the criminal goal or overall plan have persisted without fundamental alteration, notwithstanding variations in personnel and their roles.") (internal quotation marks omitted). Instead, what matters here is that the Children Defendants' participation in the conspiracy continued well into their adulthood. Ms. Martinez was held until Christina was 24, Jack was 28, and Jefferson Jr., who was then living in the home, was 30. (Compl. n.1, ¶ 10.) The Complaint clearly alleges that all three Children Defendants continued to exploit Ms. Martinez's forced labor each time that they returned home as adults. (Compl. ¶¶ 54-56); *see United States v. Wong*, 40 F.3d 1347, 1368 (2d Cir. 1994) (recognizing that "a defendant may ratify his pre-eighteen [year-old] participation in a [RICO] conspiracy by continued participation after attaining majority"). The Children Defendants also expressed their on-going support for the conspiracy by continuing to follow, even as adults, the family rule that Ms. Martinez's existence was not to be discussed with anyone outside of the Calimlim family. (Compl. ¶ 60.) And, of course, Jefferson Jr.'s on-going

participation in the conspiracy is even clearer, as he was convicted for one of the predicate acts. In sum, the Children Defendants' former youth is no bar to their conspiracy liability both because they participated in and supported the conspiracy as adults and because their adult participation served to ratify their actions as minors. *See Wong*, 40 F.3d at 1366 (citing *United States v. Welch*, 15 F.3d 1202, 1211-12 (1st Cir. 1993) and *United States v. Maddox*, 944 F.2d 1223, 1233 (6th Cir. 1991)).[14]

The plaintiff is not required to allege the exact moment at which each defendant agreed to join the conspiracy in order to properly plead a RICO conspiracy. *See United States v. Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("The government is not required to prove . . . exactly when or how a conspiracy was formed or when a particular defendant joined the scheme . . . .") (internal quotation marks omitted), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in East Africa*, 549 F.3d 146 (2d Cir. 2008). To require such detail would not only be contrary to the well-established principles of notice pleading, it would also be tantamount to requiring direct evidence of the agreement itself — again, something which has never been required.[15] *See United States v. Koenig*, 856 F.2d 843, 854 (7th Cir. 1988) ("Because conspiracies are carried out in secret, direct proof of agreement is rare."); *United States v. Nesbitt*, 852 F.2d 1502, 1510 (7th Cir. 1988) ("Not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the sole support for a [conspiracy] conviction.") (internal citation and quotation marks omitted).

---

[14] The cases that the Parent Defendants cite are not on point. *United States v. Jebara*, 313 F. Supp. 2d 912, 919 n.9 (E.D. Wis. 2004), deals with a sentencing enhancement of no relevance to this case. The footnote that the Parent Defendants cite from *Tison v. Arizona*, 481 U.S. 137, 171 n.10 (1987), is not dispositive. The footnote recognizes that while youth is relevant to culpability, it is not an outright bar to liability.

[15] Plaintiff more than adequately pleads facts establishing the existence of the conspiracy and each of the Defendants' participation in it. *Frymire v. Peat, Marwick, Mitchell & Co.*, 657 F. Supp. 889, 895-96 (N.D. Ill. 1987), which the Defendants cite in support of the assertion that the conspiracy claim is not adequately supported, merely requires that plaintiff allege an agreement to join the conspiracy and an agreement to the commission of two predicate acts. The Complaint clearly alleges facts supporting the existence of both of these agreements. No further detail is required.

The Parent Defendants' argument that their children cannot have agreed to join with them in a RICO conspiracy because they were "living the only life they ever knew," (Mot. to Dismiss 16), is simply wrong. Family members may of course join together to commit illegal acts, including violations of RICO. When put in service of an illegal objective, characteristics of a family — such as interdependence and mutual support — overlap with the factors tending to prove the existence of a conspiracy. *Cf. United States v. Ashman*, 979 F.2d 469, 485 (7th Cir. 1992) (explaining that "interdependence and mutual benefit support the inference of common agreement" to conspire). This overlap hardly makes plaintiff's RICO conspiracy claim a "proverbial square peg[]."

Indeed, the facts of this case illustrate why conspiracy — under both the common law and under RICO — is a separate offense that does not merge with the substantive violation. Conspiracies often pose great risk of harm because "joint action is, generally, more dangerous than individual action." *Townsend*, 924 F.2d at 1394 ("Conspiracies, which are really 'agreements to agree' on the multitude of decisions and acts necessary to successfully pull off a crime, pose an additional risk that the object of the conspiracy will be achieved, and so warrant additional penalties."). The facts alleged in the Complaint make clear that it was only through the joint action of the entire Calimlim family that Ms. Martinez could have been held in captivity and forced to labor against her will for nearly two decades. The Parent Defendants are more culpable precisely because they involved one another and the Children Defendants in their offenses. Because the Complaint describes in detail how each co-conspirator knowingly facilitated the Parent Defendant's in their scheme, the Parent Defendants' effort to dismiss Count II should be rejected.

## IV.    Ms. Martinez Alleges a Cognizable Claim Under WOCCA.

Ms. Martinez has properly alleged a claim pursuant to WOCCA.  *See* Wis. Stat. §
946.83(3).  While WOCCA is similar to RICO, "the Wisconsin variation has defined [terms like]
'pattern of racketeering activity' and [t]hus, while the federal courts have discussed those terms,
and similar terms, and those discussions are helpful, the real test . . . is whether, under
Wisconsin's definition of those terms," a claim has been alleged.  *State v. O'Connell*, 179 Wis.
2d 598, 610, 508 N.W.2d 23, 28 (Ct. App. 1993).

WOCCA broadly defines "enterprise," in relevant part, as a "group of individuals
associated in fact although not a legal entity" and may include both "illicit and licit enterprises."
Wis. Stat. § 946.82(2).  In *O'Connell*, the court rejected an argument that a two-person
association-in-fact that stole art from a historical society over an eighteen-month period had no
continuity, no framework or superstructure, and no distinguishing characteristics.  *Id.*  The court
found the association within WOCCA's ambit because the defendants lived together, bought and
sold antiques together, rented a storage shed to keep their antiques, dealt with antique dealers,
received a check from the antique dealer and wrote checks to each other.  *O'Connell*, 179 Wis.
2d at 605, 508 N.W.2d at 26.  Some of this activity was licit, and some was illicit.  *Id.*  The
Defendants here similarly engaged in several licit activities, including living, running a
household, attending church, and vacationing together.  (Compl. ¶¶ 10-13, 20, 52, 68.)  They also
engaged in many illicit activities: trafficking, harboring, and exploiting Ms. Martinez.  (*See*, *e.g.*,
Compl. ¶¶ 36, 40, 43, 46, 51-55, 68, 71-74, 78-79, 81.)  The Enterprise is an association-in-fact
under WOCCA.

The Parent Defendants' argument that that "enterprise" is indistinguishable from the
pattern of racketeering activity is unavailing.   As the Wisconsin Court of Appeals articulated:
"It is **not necessary to show that the enterprise has some function wholly unrelated to the**

**racketeering activity**, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses." *O'Connell*, 179 Wis. 2d at 606-07, 508 N.W.2d at 26 (emphasis added). The Parent Defendants' attempt to require "some function wholly unrelated to the racketeering activity," while discounting the many licit activities of the Calimlim Family Enterprise, fails to effectively challenge Ms. Martinez's WOCCA claim. That some of their activities were legitimate, and others illegitimate underscores the distinction between the enterprise and the pattern of racketeering activity.

Ms. Martinez's claim also satisfies WOCCA's definition of the term "pattern of racketeering activity," which requires that racketeering activities "have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics." Wis. Stat. § 946.82(3). Satisfying all listed factors is unnecessary because the statute is worded in the disjunctive. *O'Connell,* 179 Wis. 2d at 615, 508 N.W.2d at 30. Ms. Martinez alleged racketeering activity with the same or similar intents (to conceal Ms. Martinez and coerce her forced labor), results (the receipt of domestic housekeeping services for an illegally low "salary"), victims (Ms. Martinez) and methods of commission (isolating Ms. Martinez). Ms. Martinez has satisfied the definition of "pattern of racketeering activity,"[16] and, thus, has stated a claim under WOCCA.

## V.     Ms. Martinez Alleges a Viable Theory of Relief Under the Thirteenth Amendment of the U.S. Constitution and Under 18 U.S.C. § 1584.

The Thirteenth Amendment provides, "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. The

---

[16] WOCCA's definition of "pattern of racketeering activities" also requires three incidents of racketeering activity. As discussed at length in the Federal RICO section, *supra* at II.B, Martinez has identified a multitude of incidents occurring frequently and regularly over the course of nineteen years. (*See also* Compl. ¶ 114.)

amendment also grants Congress the "power to enforce this article by appropriate legislation." U.S. Const. amend. XIII, § 2. Compulsory labor, peonage, and involuntary servitude, (such as experienced by Ms. Martinez), arise under Section One of the Thirteenth Amendment, which is "undoubtedly self-executing without any ancillary legislation." *Civil Rights Cases,* 109 U.S. 3, 20 (1883); *see also Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind. 1991) ("[S]uits attacking compulsory labor itself may rest on the [T]hirteenth [A]mendment.").

The Parent Defendants violated the Thirteenth Amendment when they forced Ms. Martinez to work against her will without compensation and threatened and coerced her. Because Section One of the Thirteenth Amendment is self-executing, Ms. Martinez may bring a cause of action directly under the Thirteenth Amendment.

Indeed, there is precedent for a private right of action under the Thirteenth Amendment in the Eastern District of Wisconsin. In *Weidenfeller v. Kidulis*, 380 F. Supp. 445 (E.D. Wis. 1974), two individuals with mental disabilities sued private mental institutions for compelling the individuals to work without compensation in violation of the Thirteenth Amendment. 380 F. Supp. at 447. Defendants brought a motion to dismiss for failure to state a claim upon which relief could be granted. *Id.* The court held that the plaintiffs' private cause of action under the Thirteenth Amendment was a sufficient legal theory to survive defendants' motion to dismiss. *Id.* at 452. *See also, Terry Props., Inc. v. Standard Oil Co.*, 799 F.2d 1523, 1533-34 (11th Cir. 1986) (citing *City of Memphis v. Greene*, 451 U.S. 100, 120 (1981)) ("corporate appellees, as private actors, may . . . be liable directly under the Thirteenth Amendment as it absolutely prohibits the practice of slavery.")

Because Ms. Martinez is a victim of involuntary servitude, (Compl. ¶¶ 130-135), and because the Eastern District of Wisconsin has recognized a private cause of action under the

Thirteenth Amendment, Ms. Martinez states a claim upon which relief can be granted. Parent Defendants base their argument almost entirely on a string cite of district court cases, (Defs. Mot. Dismiss at 16-17), ignoring this Court's precedent.

A court may find a private cause of action in a statute that "prohibit[s] certain conduct or create[s] federal rights in favor of private parties." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979). In *Manliguez v. Joseph*, 226 F. Supp. 2d 377 (E.D.N.Y. 2002), the court implied a civil cause of action under 18 U.S.C. § 1584. 226 F. Supp. at 384. The *Manliguez* court reasoned that "recognizing a private civil cause of action for involuntary servitude would be consistent with the underlying legislative purpose of section 1584 because it would provide a victim with a direct and efficient means of protecting his or her rights and deter potential offenders from engaging in behavior that the statute was designed to prohibit." *Id.*[17]

*Manliguez*'s reasoning applies fully here. Defendants and co-conspirators forced Ms. Martinez to work against her will without compensation, threatened her with physical and legal harm, and used mental and physical coercion in violation of 18 U.S.C. § 1584. (Compl. ¶¶ 130-135.) An implied civil cause of action under 18 U.S.C. § 1584 would protect Ms. Martinez's rights and deter potential offenders from engaging in this type of behavior.

## VI. Counts V and VI Should Not Be Stayed Pending Re-Sentencing of the Parent Defendants.

Finally, the Parent Defendants' attempt to use the stay provision under 18 U.S.C. § 1595 is nothing more than an effort to stall this case. A jury convicted the Parent Defendants of forced labor and alien harboring for personal financial benefit more than two years ago. The criminal

---

[17] The Children Defendants suggest that *Manliguez* is contrary to congressional intent, because it was decided prior to 18 U.S.C. § 1595's enumerated list of private rights of action. However, this argument fails under Congress's recent amendment of 15 U.S.C. § 1595 ***which includes a civil cause of action for 18 U.S.C. § 1584.*** There is no longer any doubt as to Congress's intent for there to be a civil cause of action under 18 U.S.C. 1584. *See William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008*, Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067 (2008).

investigation, prosecution, and trial have ended; the Parent Defendants have exhausted their appeals and the U.S. Supreme Court has denied *certiorari*. The Department of Justice, the institution with the most at stake in the criminal proceedings against the Calimlim defendants, has *not* intervened and has *not* requested a stay of this civil action.

According to the legislative history, the Department of Justice requested that Congress create the stay provision to prevent a civil action from "hinder[ing] prosecutors' abilities to try a case unfettered by the complications of civil discovery." H.R. Rep. No. 108-264, pt. 2, at 16-17 (2003). At this late stage in the proceedings, the *only* matter before the criminal court is an order for resentencing that includes sentencing enhancements. *United States v. Calimlim*, 538 F.3d 706, 715-18 (7th Cir. 2008), *cert. denied*, __ S. Ct. __, No. 08-634, 2009 WL 56256 (U.S. Jan. 12, 2009). Civil discovery in this matter is unlikely to have any impact whatsoever on the increase in prison sentences ordered by the Seventh Circuit. And, in light of the Parent Defendants' convictions on the underlying forced labor charges, the issue on Counts V and VI of the Complaint is one of damages, not one of liability.

To institute a stay now would allow the Parent Defendants to misuse the statute, permitting them to delay this matter. In light of the Parent Defendants' convictions, and the potential for prejudice to Ms. Martinez, the motion to stay Counts V and VI should be denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, Martinez respectfully requests that this Court DENY the Parent Defendants' Motion to Dismiss and DENY the Parent Defendants' Motion to Stay.

Dated: January 16, 2009

Respectfully submitted,

/s/ Robert Friebert
Robert Friebert
M. Andrew Skwierawski
Shannon A. Allen
S. Todd Farris
FRIEBERT, FINERTY & ST. JOHN, S.C.
Two Plaza East - Suite 1250
330 East Kilbourn Avenue
Milwaukee, Wisconsin 53202
Telephone: (414) 271-0130
Facsimile: (414) 272-8191

Jerold S. Solovy
Reena R. Bajowala
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, IL  60611-7603
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

Martina E. Vandenberg
Sarah A. Maguire
Melissa A. Cox[*]
JENNER & BLOCK LLP
1099 New York Avenue, NW - Suite 900
Washington, D.C.  20001-4412
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

---

[*] *Admission pending in the Eastern District of Wisconsin.*